Joshua Jordan, admitted Pro Se
6650 Rivers Ave, STE 100
Charleston, SC, 29406
Tel: 843.790.3989
joshlegalstuff@gmail.com

RECEIVED

2024 JUN 28  AM 11: 44

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Prehired, LLC, et al,<br><br>Debtors | Case No.: 1:22-bk-11007 (JTD)<br><br>Adv. Proc. No. 23-50438 (JTD)<br><br>**INTERVENOR JORDAN'S DECLARATION IN SUPPORT** OF MOTION TO ENFORCE THE FINAL JUDGMENT AND ORDER, FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, CONTEMPT SANCTIONS, AND FOR DAMAGES, LEGAL FEES, AND EXPENSES |

I, Joshua Jordan, hereby declare as follows:

1.  I am the Intervenor in the above-entitled action. I have firsthand knowledge of the facts stated in the Motion and this Declaration and could and would competently testify to them if called upon to do so.

2.  I make this Declaration in support of my Motion to Enforce the Final Judgment and Order, for Declaratory Judgment, and for Damages, Legal Fees, and Expenses ("the Motion").

3. I confirm that the factual allegations contained in the Motion filed in this action are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Respectfully submitted on June 20, 2024.

By: /s/ Joshua Jordan
Joshua Jordan, admitted pro se
6650 Rivers Ave, STE 100
Charleston, SC, 29406
Tel: 843.790.3989
joshlegalstuff@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2024 a true and correct copy of this document is being filed and mailed with electronic return receipt requested to:

Clerk of the Court
United States Bankruptcy Court
District of Delaware
824 N. Market Street, 3rd Floor
Wilmington, DE 19801

By: /s/ Joshua Jordan
Joshua Jordan, Pro Se

RECEIVED
2024 JUN 28   AM 11: 44
CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

Joshua Jordan, admitted Pro Se
6650 Rivers Ave, STE 100
Charleston, SC, 29406
Tel: 843.790.3989
joshlegalstuff@gmail.com

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>Prehired, LLC, et al,<br><br>Debtors | Case No.: 1:22-bk-11007 (JTD)<br>Adv. Proc. No. 23-50438 (JTD)<br><br>INTERVENOR JORDAN'S MOTION TO ENFORCE THE FINAL JUDGMENT AND ORDER, FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, CONTEMPT SANCTIONS, AND FOR DAMAGES, LEGAL FEES, AND EXPENSES |

Intervenor Joshua Jordan ("Jordan"), admitted pro se, hereby moves this Court for an order (1) enforcing the Stipulated Final Judgment and Order (the "Order") [Docket No. 211] as to the State of Washington (the "State"), (2) declaring that Mr. Jordan is a released party under the Order, (3) granting injunctive relief to prevent the State from pursuing any further claims against Mr. Jordan related to his actions as Prehired's assignee and agent, (4) finding the State in contempt of court for violating the Order and imposing appropriate sanctions, and (5) awarding Mr. Jordan damages, legal fees, and expenses incurred as a result of the State's violation of the Order. In support of this Motion, Mr. Jordan states as follows:

**BACKGROUND**

1. On September 29, 2022, Prehired, LLC and its affiliated entities (collectively, the "Prehired Entities" or "Prehired Defendants" or "Prehired") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. (Case No. 22-11007, Docket No. 1). The cases were subsequently converted to Chapter 7 on November 22, 2022. (Case No. 22-11007, Docket No. 175).

2. On July 13, 2023, the State of Washington (the "State") , along with other state and federal governmental entities (collectively, the "Governmental Entities"), commenced this adversary proceeding against the Prehired Entities, asserting various claims related to the Prehired Entities' alleged unlawful practices. (Adv. Proc. No. 23-50438, Docket No. 1).

3. On November 2, 2023, this Court entered an Order approving the Order between the Prehired Entities and the Governmental Entities. (Case No. 22-11007, Docket No. 211-2). The Order resolved all claims asserted in the adversary proceeding. (Dkt No. 211-2, Order ¶ 47).

4. The Order defines the "Prehired Defendants" as "Prehired, LLC, Prehired Recruiting, LLC, and Prehired Accelerator, LLC, and their successors and assigns." (Dkt No. 211-2, Order ¶ 29(k)) (emphasis added).

5. Mr. Jordan is the assignee of Prehired by virtue of an Assignment Agreement dated June 25, 2022. (Ex. 5, Assignment Agreement). The Assignment Agreement states that "Assignor agrees to defend and indemnify the Assignee from any and all problems and expenses, past, present, and future, related to this Agreement." (Ex. 5, Assignment Agreement ¶ 4).

6. The Assignment Agreement also reflects Mr. Jordan's prescient concerns about the Washington Attorney General's office engaging in misconduct in its investigation of Prehired. The Agreement states that 'the ongoing actions of the [Washington Attorney General] have caused immediate and irreparable damage to the Parties' wellbeing, livelihood, property, income, and reputation and is likely future actions of the [Washington Attorney General] will continue to cause irreparable harm.' (Ex. 5, Assignment Agreement at 1). It further notes that

the Washington Attorney General's complaint 'featured numerous statements that were not only intellectually dishonest but were predominantly fictional, fabricated, and deceitful throughout the entire complaint, which led the Parties to believe this lawsuit is entirely politically motivated and/or the result of rampant corruption in the State AG's office.' (Id.). These statements demonstrate that Mr. Jordan had reason to believe, even before the Order was executed, that the Washington Attorney General's office was acting improperly and in bad faith.

7. Jordan's Employment Agreement with Prehired, dated January 1, 2018, also contains an indemnification clause stating: "The Employer agrees to defend and indemnify the Employee from any and all claims, losses, damages, reasonable expenses, including attorneys' fees, as it relates to this agreement." (Ex. 6, Employment Agreement ¶ V).

8. The Order contains a broad release provision that discharges the Prehired Defendants – defined to include Prehired LLC's assignees – from "all potential liability" that was or could have been alleged by the Governmental Entities. (Dkt No. 211-2, Order ¶ 47).

9. The Order was drafted by the State of Washington's counsel, Assistant Attorney General Tad O'Neill. (Dkt No. 211-2, Order at 16-17). Mr. O'Neill chose to define "Prehired Defendants" to include assignees, and to provide for a broad release of those Defendants.

10. Despite the clear language of the Order releasing Prehired LLC's assignees, the State of Washington continued to pursue claims against Mr. Jordan individually in State of Washington v. Prehired LLC et al., No. 22-2-08651-3 SEA (King Cnty. Super. Ct.) (the "Washington Action").

11. On January 11, 2024, just before the scheduled hearing on the State of Washington's motion for summary judgment against Mr. Jordan and the Prehired Entities, the State chose to only dismiss the Prehired Entities based on a prior order. However, they moved forward with seeking summary judgment against Mr. Jordan alone. (Ex. 1, Order Granting Defendants' Motion to Dismiss). The court subsequently granted both of the State's motions: it dismissed

the Prehired Entities and allowed the claims against Mr. Jordan to continue, which ultimately led to a judgment against him just days later.

12. On January 16, 2024, the King County Superior Court entered summary judgment against Mr. Jordan in the Washington Action, holding him personally liable for over $1 million. (Ex. 2, Order Granting Plaintiff State of Washington's Motion for Partial Summary Judgment Against Joshua Jordan).

13. Prior to the entry of summary judgment, Mr. Jordan's counsel informed the State several times that the State was violating the Order by proceeding against Mr. Jordan individually, as he was released as Prehired's assignee under the Assignment Agreement and indemnified under his Employment Agreement. (Ex. 5, Email Correspondence). Counsel requested a continuance to address the impact of the dismissal of the Prehired Entities on Mr. Jordan's case. (Id.). The Washington AG's Office refused, stating that the release of Prehired's assignees was "irrelevant" to Mr. Jordan's personal liability. (Id.).

14. On April 12, 2024, the Washington court entered a final judgment against Mr. Jordan in the amount of $1,435,546.28. (Ex. 3, Final Judgment). The judgment states that "through Prehired, engaged in unfair and deceptive acts and practices in trade or commerce," and that "Jordan participated in, and knowingly approved of, Prehired's unfair and deceptive acts and practices in violation of the CPA, and he is personally liable for every violation." (Id. at 3).

15. In prosecuting its claims against Mr. Jordan in the Washington Action, the State consistently alleged and argued that Mr. Jordan acted on behalf of the Prehired Entities at all times, and never in his personal capacity. (See, e.g., Ex. 3, Final Judgment at 3 (stating Jordan acted "through Prehired"); Ex. 2, Summary Judgment Order at 3 (same)). Jordan, at all times, unless explicitly stated otherwise, represented the Prehired entities.

16. To date, Mr. Jordan has expended over $2 million in legal fees defending himself against allegations from the State of Washington. This legal struggle, compounded by other companies exploiting Prehired's financial vulnerabilities—which led to defaults on millions of dollars owed to Prehired and competitors poaching customers via social media—has

culminated in the loss of both his company and career. Furthermore, the continued litigation over claims from which he was previously released has financially devastated him, reducing his assets to less than $600. Presently, Mr. Jordan is dependent on financial support from family as he endeavors to recuperate from this significant financial blow.

17. The Order states the Court will retain jurisdiction of this matter for the purpose of enforcing this Order. (Dkt No. 211-2, Order p.17 ¶ 48 and p.23 ¶ 4).

## ARGUMENT

## I. The Court Should Enforce the Order Against the State of Washington

### A. The Plain Language of the Order Unambiguously Releases Mr. Jordan

The release language in the Order is broad and unqualified. Paragraph 47 states: "The Bureau and States release and discharge the Prehired Defendants from all potential liability for law violations that the Bureau or any of the States has or might have alleged in the Complaint, to the extent such practices occurred before the Effective Date and the Bureau and States know about them as of the Effective Date." (Dkt No. 211-2, Order ¶ 47). This release discharges the "Prehired Defendants"—defined to include Prehired LLC's assignees—from "all potential liability" alleged by the Governmental Entities. The release is not limited to certain capacities or types of claims. If the State intended to preserve claims against Mr. Jordan individually, it was incumbent upon them to explicitly carve those claims out from the release. They did not do so, despite being the authors of the settlement agreement which became the Order.

It is crucial to underscore that the State of Washington, led by Attorney General Tad O'Neill, acted as the lead attorney in both the Washington Action against Mr. Jordan and the Prehired Defendants and the adversarial proceeding in this court against the Prehired Entities. He personally signed off on all related documents in both jurisdictions. Despite this, he has blatantly violated the Court's order that he himself drafted and stipulated to. This flagrant disregard for judicial orders not only undermines the integrity of the legal process but also showcases a troubling level of corruption within the State's actions, where adherence to legal mandates appears selectively enforced.

As Prehired LLC's assignee under the Assignment Agreement (Ex. 5), Mr. Jordan clearly falls within the definition of "Prehired Defendants." The unequivocal language of the Order releases him from the claims asserted by the State in the Washington Action. The State cannot evade the clear and unambiguous terms it drafted, stipulated to, and which this court ordered to be followed.

## B. The State's Inconsistent Positions Reinforce That Mr. Jordan Must Be Released

The doctrine of judicial estoppel prevents a party from asserting a position in a legal proceeding that contradicts or is inconsistent with a previously asserted position. As the U.S. Supreme Court articulated:

"[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." Davis v. Wakelee, 156 U.S. 680, 689 (1895).

This rule, known as judicial estoppel, "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." New Hampshire v. Maine, 532 U.S. 742, 749 (2001).

In this case, the State of Washington has repeatedly asserted that Mr. Jordan acted on behalf of the Prehired Entities at all times:

- The Final Judgment finds: "Jordan participated in, and knowingly approved of, Prehired's unfair and deceptive acts and practices in violation of the CPA, and he is personally liable for every violation." (Ex. 3 at 3).
- The Summary Judgment Order similarly holds: "Jordan participated in and knowingly approved of all of Prehired's violations...and is therefore personally liable for each and every violation." (Ex. 2 at 3).

**The State cannot have it both ways.** The State's position, as expressed in the email correspondence with Mr. Jordan's counsel (Ex. 7), that Mr. Jordan cannot be a released party because he was found individually liable, is not only inconsistent with its own allegations and the Washington court's findings but also contravenes basic principles of corporate law and agency.

Again, it is crucial to emphasize that the State of Washington, represented by its counsel, Assistant Attorney General Tad O'Neill, actively participated in drafting and signing the stipulated settlement agreement, which became the Order. It is crucial to underscore that the State, through Attorney O'Neill, acted as the lead attorney in both the Washington Action against Mr. Jordan and the Prehired Defendants and the adversarial proceeding in this court against the Prehired Entities. He personally signed off on the related documents in both jurisdictions. This agreement was negotiated and executed with the full understanding and intention that it would become a binding final judgment and order by this Court. The State's role in this process further underscores the applicability of judicial estoppel. Having succeeded in maintaining its position during the negotiation and execution of the Order, the State cannot now assume a contrary position merely because its interests have changed.

Throughout the Washington Action, the State has maintained that Mr. Jordan's liability stems entirely from his actions as CEO and agent of Prehired. The Complaint alleges that "Jordan, individually, and through Prehired, engaged in unfair and deceptive acts and practices" (Ex. 3, Final Judgment at 3) and that "Jordan participated in, and knowingly approved of, Prehired's unfair and deceptive acts and practices" (Ex. 2, Summary Judgment Order at 3).

These allegations make clear that Mr. Jordan's purported liability arises solely from his actions as an officer and agent of Prehired. It is a fundamental tenet of corporate law that a company can only act through its agents and that the acts of a company's officers and directors, within the scope of their authority, are attributable to the company itself. By releasing Prehired from all claims, the State has necessarily released Mr. Jordan from any vicarious liability arising from his actions as Prehired's agent. The State cannot circumvent the Order by pursuing Mr. Jordan individually for the same conduct for which it has released Prehired. Such an approach would render the release of Prehired meaningless and would violate the covenant of good faith and fair dealing implied in every contract.

See, e.g., Chamison v. HealthTrust, Inc., 735 A.2d 912, 921 n.29 (Del. Ch. 1999) ("The covenant [of good faith and fair dealing] requires contracting parties to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain.").

Moreover, the State's assertion that the "Delaware order is not relevant" to Mr. Jordan's individual liability (Ex. 7) is flatly incorrect. The Order, which was ordered by this Court, expressly defines "Prehired Defendants" to include Prehired's "successors and assigns" (Ex. 4, Order ¶ 29(k)). As Prehired's assignee under the Assignment Agreement (Ex. 5), Mr. Jordan falls squarely within the scope of the release. The State, having drafted the release language to include assignees, cannot now claim that the release is irrelevant to Mr. Jordan.

The State's attempt to divorce Mr. Jordan's liability from Prehired's ignores the fundamental basis for the Washington court's findings and the reality of Mr. Jordan's role. Throughout the entire period in question, Mr. Jordan acted solely in his capacity as CEO, employee, and representative of Prehired. He never acted in a personal capacity or for his own individual benefit. The Washington court's findings that Mr. Jordan acted "through Prehired" and that his liability is based on "Prehired's unfair and deceptive acts and practices" unequivocally demonstrate that his actions were inextricably linked to his role within the company.

It is crucial to note that Mr. Jordan had no knowledge of or input into the Settlement Order until after it had been filed with this Court. The Order was negotiated and filed entirely without his participation or consent. At the time of the Order's negotiation and filing, Mr. Jordan was no longer the CEO of Prehired, as the company had entered Chapter 7 bankruptcy. His sole remaining connection to Prehired was as an assignee, a status that places him squarely within the definition of "Prehired Defendants" in the Order. Given these circumstances, it is clear that the release of claims against Prehired necessarily encompasses Mr. Jordan, as his alleged liability stems entirely from actions taken on behalf of Prehired. To argue otherwise is illogical and legally unsupportable.

In short, the State's position is not only inconsistent with its own allegations and the Washington court's findings but also contrary to established principles of corporate law and contract interpretation. The State cannot escape the unambiguous terms of the Order by pursuing claims against Mr. Jordan that are based entirely on his actions as an officer and agent of Prehired. To allow the State to do so would sanction a blatant end-run around the release, undermining the finality and integrity of this Court's order approving the Order. This Court should reject the State's attempt to evade the clear language and intent of the Order and hold that Mr. Jordan, as Prehired's agent and assignee, is a released party under the Agreement.

## C. The Order Fulfilled Prehired's Contractual Indemnification Obligations to Mr. Jordan Under the Assignment Agreement and Employment Agreement

The Assignment Agreement and Mr. Jordan's Employment Agreement both obligated Prehired to indemnify Mr. Jordan for any legal issues related to the State of Washington's claims. The Assignment Agreement states that "Assignor agrees to defend and indemnify the Assignee from any and all problems and expenses, past, present, and future, related to this Agreement." (Ex. 5, Assignment Agreement ¶ 4). Similarly, the Employment Agreement provides that "The Employer agrees to defend and indemnify the Employee from any and all claims, losses, damages, reasonable expenses, including attorneys' fees, as it relates to this agreement." (Ex. 6, Employment Agreement ¶ V).

By including Mr. Jordan as a released assignee in the Order it negotiated, the State enabled Prehired to uphold these indemnification promises. Having released Prehired's assignees, the State cannot now deprive Mr. Jordan of the indemnification protections he bargained for in the Assignment Agreement and Employment Agreement. Allowing the State to proceed against Mr. Jordan individually would render these indemnification clauses meaningless and would constitute a grave injustice.

Furthermore, Section 145(a) and (b) of the Delaware General Corporation Law explicitly empowers corporations to indemnify their current and former corporate officials from expenses

incurred in legal proceedings "by reason of the fact that the person is or was a director, officer, employee, or agent of the corporation." Homestore, Inc. v. Tafeen, 888 A.2d 204, 211 (Del. 2005). This statutory provision underscores the legitimacy and enforceability of the indemnification clauses in Mr. Jordan's agreements with Prehired, reinforcing his entitlement to indemnification for the claims brought against him by the State of Washington.

## D. Construing Any Ambiguity Against the State as Drafter Requires Releasing Mr. Jordan

It is a well-established legal principle that any ambiguity in a contract must be construed against the drafter. See In re NVF Co., 309 B.R. 698, 704-05 (Bankr. D. Del. 2004); In re Mallinckrodt PLC, 20-12522 (JTD), at *9 (Bankr. D. Del. May 31, 2023).

The State of Washington drafted the release provisions in the Order. We contend that there is no ambiguity in these provisions: they clearly and unequivocally release Mr. Jordan from the claims asserted by the State. However, even if the Court were to find any ambiguity, such ambiguity must be construed against the State as the drafter. The State, as a sophisticated party represented by counsel, could have explicitly excluded Mr. Jordan from the release if it intended to. Instead, it chose to broadly release Prehired's assignees without qualification. Therefore, the State must be held to the terms it drafted.

This argument is further reinforced by a ruling from this very court, by the same judge presiding over the current matter. In **In re Mallinckrodt PLC**, 20-12522 (JTD), at *9 (Bankr. D. Del. May 31, 2023), Judge John T. Dorsey stated, "Once the Court determines that a contract is ambiguous, the factfinder may then consider admissible extrinsic evidence to resolve the parties' intended meaning of the ambiguous terms." This case underscores the principle that ambiguous provisions are construed against the drafter, a precedent directly applicable to the current situation. This prior ruling exemplifies the consistent application of the principle of construing ambiguities against the drafter, thereby strengthening the argument that Mr. Jordan should be released from the claims asserted by the State.

In conclusion, the State of Washington must be held accountable to the clear terms it drafted, stipulated to, and which this court ordered to be obeyed. Given the precedents set by this court and Judge Dorsey's previous rulings, it is evident that any ambiguity, if found, must be construed against the State, thus necessitating the release of Mr. Jordan from the claims in question. This principle not only supports our interpretation but reinforces the fairness and integrity of the judicial process.

## E. Enforcing the Order Is Necessary to Protect the Integrity of the Bankruptcy Process and Prevent Manifest Injustice

Permitting the State to violate the Order would undermine the finality of this Court's orders and the legitimacy of the bankruptcy process. "It is axiomatic that a court possesses the inherent authority to enforce its own orders." In re Continental Airlines, Inc., 236 B.R. 318, 325 (Bankr. D. Del. 1999). It would send the message that a state can negotiate and execute a broad release in a bankruptcy case, then proceed to violate that release with impunity in its own state courts. This would have a chilling effect on the ability of debtors to negotiate and rely upon settlements in bankruptcy.

Moreover, allowing the State's actions to stand would work a manifest injustice on Mr. Jordan. He has incurred over $2 million in attorneys' fees over the last few years and suffered the loss of his company and career, because the State chose to pursue claims against him that it had released in a binding federal court order. The State's actions have financially devastated Mr. Jordan and cost him his livelihood. Equity demands that the Order be enforced and Mr. Jordan be afforded the protection of the release and the indemnification Prehired fulfilled through the Order. Justice requires that the Order be enforced as written and Mr. Jordan be declared a released party. Anything less would reward the State's inequitable conduct and work a manifest injustice.

Mr. Jordan's concerns about the Washington Attorney General's office acting dishonestly and in bad faith, as expressed in the Assignment Agreement nearly two years ago, have proven to be well-founded. Despite the passage of time, the State's pursuit of released claims against Mr. Jordan, in direct violation of the Order and this Court's order, demonstrates precisely the sort of misconduct

and corruption that Mr. Jordan anticipated. The State's actions not only vindicate Mr. Jordan's early

misgivings but also reinforce the urgent need for this Court to intervene and prevent further injustice.

## II. The Court Should Issue a Declaratory Judgment That Mr. Jordan Is a Released Party

Section 105(a) of the Bankruptcy Code expressly provides bankruptcy courts the equitable

power to "issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of this title." 11 U.S.C. § 105(a). This section has been construed to give a bankruptcy

court "broad authority" to provide equitable relief appropriate to assure the orderly conduct of

reorganization proceedings. In re Combustion Engineering, Inc., 391 F.3d 190, 236 (3d Cir. 2004).

Based on foregoing arguments and the plain language of the Order, Mr. Jordan is clearly a

released party. The Agreement unambiguously releases Prehired's assignees. Mr. Jordan is

indisputably Prehired's assignee under the Assignment Agreement, which also requires Prehired to

indemnify him. The State argues Mr. Jordan is liable for Prehired's conduct, while simultaneously

arguing the release of Prehired doesn't apply to him. These contradictory positions cannot be

reconciled.

To resolve this dispute and clarify the parties' rights, the Court should issue a declaratory

judgment that Mr. Jordan is a released party under the Order. Such a declaration is necessary to

prevent the State's ongoing violation of the Agreement and this Court's order, and to uphold the

indemnification obligations in the Assignment Agreement and Employment Agreement.

## III. The Court Should Award Mr. Jordan Damages, Legal Fees, and Expenses Related to the State of Washington's Violation of the Order

On November 2, 2023, this Court approved the Order, which was a stipulated settlement

agreement drafted by the State and became a final judgment order, between the Governmental

Entities and the Prehired Entities. (Case No. 22-11007, Docket No. 211). However, the Washington

Attorney General's office intentionally violated that order. Not only did they fail to promptly release and

dismiss the ongoing lawsuits against the Prehired Entities in Washington until months later in January

2024 (waiting to do it a day before the summary judgment hearing against the Prehired Entities and Mr. Jordan personally), but they also refused to dismiss Mr. Jordan, who as employee and assignee of the Prehired Entities, was a released party under the Order.

Throughout the Washington Action, the State consistently maintained that Mr. Jordan was acting as a representative of the Prehired Entities in his capacity as CEO, and never alleged that he was acting in a personal capacity. (See Ex. 3, Final Judgment at 3; Ex. 2, Summary Judgment Order at 3). By releasing all claims against the Prehired Entities, the State necessarily released Mr. Jordan, as any liability on his part was predicated on the companies' liability.

Moreover, Mr. Jordan is an expressly named released party under the Order as Prehired's assignee. Despite being notified of these facts, as reflected in the email correspondence attached as Exhibit 7, the Washington Attorney General's office refused to dismiss Mr. Jordan from the lawsuit and instead pursued summary judgment against him personally.

As a direct result of the State's intentional violation of this Court's order, Mr. Jordan has incurred millions of dollars in legal fees and expenses related to the Washington Action and the bankruptcy proceedings. The State's bad faith conduct has unjustly enriched it at Mr. Jordan's expense. Additionally, as detailed in Exhibit 8, Mr. Jordan has made substantial positive contributions to his community, including financial support and personal time devoted to churches, charities, orphanages, and people in financial need or having severe health issues. These efforts underscore the undue hardship and injustice caused by the State's continued pursuit of claims against him, despite the clear terms of the Order. The State's actions have not only financially devastated Mr. Jordan but have also hindered his ability to continue religious based philanthropic activities, further highlighting the need for this Court's intervention to enforce the Order and grant the requested relief.

Accordingly, Mr. Jordan respectfully requests that the Court award him damages in an amount to be determined at trial, as well as all legal fees and expenses incurred as a result of the State's violation of the Order, under the Court's inherent power to sanction misconduct and pursuant to its authority under 11 U.S.C. § 105(a) to issue any order necessary to carry out the provisions of the Bankruptcy Code and enforce its own orders.

## IV. In the Alternative, the Court Should Order Prehired to Indemnify Mr. Jordan for the Washington Judgment

Even if the Court determines that Mr. Jordan is not a released party under the Order, Prehired is still obligated to indemnify him for the judgment entered against him in the Washington Action pursuant to the indemnification provisions in the Assignment Agreement and Employment Agreement.

The Assignment Agreement states that "Assignor agrees to defend and indemnify the Assignee from any and all problems and expenses, past, present, and future, related to this Agreement." (Ex. 5, Assignment Agreement ¶ 4). Similarly, the Employment Agreement provides that "The Employer agrees to defend and indemnify the Employee from any and all claims, losses, damages, reasonable expenses, including attorneys' fees, as it relates to this agreement." (Ex. 6, Employment Agreement ¶ V).

The judgment entered against Mr. Jordan in the Washington Action falls squarely within the scope of these indemnification provisions. The State's claims against Mr. Jordan arose entirely out of his actions as an officer and agent of Prehired, and the Washington court's findings of liability were expressly predicated on Mr. Jordan acting "through Prehired." (Ex. 3, Final Judgment at 3). As such, Prehired is contractually obligated to indemnify Mr. Jordan for the judgment and all related expenses.

This Court has the authority to enforce Prehired's indemnification obligations as part of its equitable powers in administering the bankruptcy estate. See In re Combustion Eng'g, Inc., 391 F.3d 190, 235 (3d Cir. 2004) ("Bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process."). Enforcing Prehired's indemnification obligations is necessary to prevent the injustice of Mr. Jordan being held personally liable for actions he took in his capacity as an officer and agent of Prehired.

Accordingly, if the Court determines that Mr. Jordan is not a released party under the Order, Mr. Jordan respectfully requests that the Court enter an order requiring Prehired to indemnify him for the

full amount of the judgment entered against him in the Washington Action, as well as all related expenses, pursuant to the indemnification provisions in the Assignment Agreement and Employment Agreement.

## CONCLUSION

The Order, drafted by the State of Washington and approved by this Court, broadly releases Prehired assignees from all claims alleged by the Governmental Entities. Mr. Jordan, as Prehired's assignee, is unambiguously a released party. He is also entitled to indemnification from Prehired under the Assignment Agreement and his Employment Agreement. The State's continued prosecution of released claims against Mr. Jordan in the Washington Action violates the Order, this Court's order, and the indemnification provisions in the Assignment Agreement and Employment Agreement.

The State's pursuit of claims has financially devastated Mr. Jordan and cost him his livelihood. Justice requires that the Order be enforced as written and Mr. Jordan be declared a released party. The Court should enforce the Agreement, direct the State to dismiss its claims against Mr. Jordan, and declare that he is a released party under the plain language of the Agreement the State itself drafted. Anything less would reward the State's inequitable conduct and work a manifest injustice.

WHEREFORE, Intervenor Joshua Jordan respectfully requests that the Court enter an order:

(a) Enforcing the Order as to the State of Washington;

(b) Directing the State of Washington to dismiss the released claims against Mr. Jordan in the King County Superior Court case (No. 22-2-08651-3 SEA), vacate the judgment against him, and cease any further action in violation of the Order;

(c) Declaring that Mr. Jordan is a released party under the Order;

(d) Awarding Mr. Jordan damages, legal fees, and expenses incurred as a result of the State of Washington's violation of the Order;

(e) Granting an injunction preventing the State of Washington from pursuing any further claims against Mr. Jordan that are related to his actions as Prehired's assignee and agent, to uphold the terms of the Order and to prevent further violation of this Court's orders;

(f) Finding the State of Washington in contempt of court for violating the Order and this Court's orders, and imposing appropriate sanctions to compel compliance and deter future violations;

(g) In the alternative, requiring Prehired to indemnify Mr. Jordan for the judgment entered against him in the Washington Action and all related expenses, pursuant to the indemnification provisions in the Assignment Agreement and Employment Agreement; and

(h) Granting such other and further relief as the Court deems just and proper.


Respectfully submitted on June 20, 2024.

By: /s/ Joshua Jordan
Joshua Jordan, admitted pro se
6650 Rivers Ave, STE 100
Charleston, SC, 29406
Tel: 843.790.3989
joshlegalstuff@gmail.com


## CERTIFICATE OF SERVICE


I hereby certify that on June 20, 2024 a true and correct copy of this document is being filed and mailed with electronic return receipt requested to:

Clerk of the Court
United States Bankruptcy Court
District of Delaware
824 N. Market Street, 3rd Floor
Wilmington, DE 19801

By: /s/ Joshua Jordan
Joshua Jordan, Pro Se

Joshua Jordan, admitted Pro Se
6650 Rivers Ave, STE 100
Charleston, SC, 29406
Tel: 843.790.3989
joshlegalstuff@gmail.com

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Prehired, LLC, et al,<br><br>Debtors | Case No.: 1:22-bk-11007 (JTD)<br><br>Adv. Proc. No. 23-50438 (JTD)<br><br>**APPENDIX OF EVIDENCE** IN SUPPORT OF INTERVENOR JORDAN'S MOTION TO ENFORCE THE FINAL JUDGMENT AND ORDER, FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, CONTEMPT SANCTIONS, AND FOR DAMAGES, LEGAL FEES, AND EXPENSES |

## **APPENDIX OF EVIDENCE**

Intervenor Joshua Jordan, pro se, submits the following Appendix of Evidence in support of the Motions as follows:

### **Table of Contents**

- Exhibit 1: Order Dismissing Prehired Defendants (excluding CEO/assignee Jordan) in State of Washington

- Exhibit 2: Order Granting State of Washington's Motion for Partial Summary Judgment Against Prehired CEO/Assignee Joshua Jordan

- Exhibit 3: Final Judgment against Assignee Jordan in State of Washington v. Prehired LLC et al.
- Exhibit 4: Delaware Bankruptcy Court's Final Judgment and Order between the Prehired Defendants and Governmental Entities ("Order") – See Docket No. 211.
- Exhibit 5: Assignment Agreement between Prehired and Joshua Jordan dated June 25, 2022
- Exhibit 6: Employment Agreement between Prehired and Joshua Jordan dated January 1, 2018
- Exhibit 7: Email Correspondence between Joshua Jordan's counsel and State of Washington's Attorney General Office
- Exhibit 8: Joshua Jordan's Personal Narrative

Respectfully submitted and dated this June 20, 2024.

By: /s/ Joshua Jordan
Joshua Jordan, Pro Se
6650 Rivers Ave. STE 100
Charleston, SC, 29406
843.790.3989
joshlegalstuff@gmail.com

### CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2024 a true and correct copy of this document is being filed and mailed with electronic return receipt requested to:

Clerk of the Court
United States Bankruptcy Court
District of Delaware
824 N. Market Street, 3rd Floor
Wilmington, DE 19801

By: /s/ Joshua Jordan
Joshua Jordan, Pro Se

AE02

# EXHIBIT 1

1

2

The Honorable Suzanne Parisien
Noted for Consideration: January 10, 2024
Without Oral Argument

3

4

5

6

7

**STATE OF WASHINGTON
KING COUNTY SUPERIOR COURT**

8

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                    Plaintiff,<br><br>          v.<br><br>PREHIRED, LLC, a Delaware limited<br>liability company;<br>PREHIRED RECRUITING, LLC, a<br>Delaware limited liability company;<br>PREHIRED RECRUITING, LLC, a<br>Florida limited liability company;<br>PREHIRED ACCELERATOR, LLC; a<br>Florida limited liability company;<br>JOSHUA JORDAN, an individual,<br>KAISHA, LLC, a Wyoming limited<br>liability company; AND ISA PLUS, LLC,<br>a Delaware limited liability company,<br><br>                    Defendants.<br><br>――――――――――――――――――――<br><br>AND RELATED CROSS-ACTIONS. | NO. 22-2-08651-3 SEA<br><br>ORDER GRANTING MOTION TO<br>DISMISS ALL CLAIMS AND<br>COUNTERCLAIMS BY AND<br>AGAINST DEFENDANTS PREHIRED,<br>LLC, PREHIRED RECRUITING, LLC<br>(DELAWARE), PREHIRED<br>RECRUITING, LLC (FLORIDA);<br>PREHIRED ACCELERATOR, LLC,<br>AND KAISHA, LLC ONLY<br><br>**[CLERK'S ACTION REQUIRED]** |

9

10

11

12

13

14

15

16

17

18

19

20

21

22          The COURT having heard the motion of Plaintiff State of Washington, and Defendants

23   Prehired LLC (Prehired), Prehired Recruiting LLC, a Delaware limited liability company (PR

24   Delaware), Prehired Recruiting LLC, a Florida limited liability company (PR Florida), Prehired

25   Accelerator (PA), and Defendant ISA Plus, LLC (ISAP) and all pleadings filed in connection

26   with the motion HEREBY ORDERS as follows:

ORDER GRANTING MOTION TO DISMISS
CLAIMS AGAINST PREHRIED LLC,
PREHIRED RECRUITING LLC, PREHIRED
ACCELERATOR LLC, AND KAISHA, LLC
ONLY - 1

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

AE04

1    (1) the State's claims against Prehired, PR Delaware, PR Florida, PA, and Kaisha shall

2         be dismissed without an award of costs to any party;

3    (2) Prehired's third-party claims against ISAP shall be dismissed without an award of

4         costs to any party; and

5    (3) ISAP's counterclaims against Prehired shall be dismissed without an award of costs

6         to any party.

7         As a result of this Order, no claims shall remain pending by or against Prehired, PR

8    Delaware, PR Florida, PA, or Kaisha in this action.

9         Nothing in this Order shall affect the remaining claims by and among the remaining

10   parties, including claims by the State against ISAP and Jordan, ISAP's cross-claims against

11   Jordan, or the Preliminary Injunction entered by this Court on June 28, 2022, to the extent it

12   applies to any person or entity other than Prehired, PR Delaware, PR Florida, PA, or Kaisha.

13        IT IS SO ORDERED.

14        DATED this 11ᵗʰ day of Jan. , 2023. 2024

15        _____

16        THE HONORABLE SUZANNE PARISIEN

17   Presented by:

18   ROBERT W. FERGUSON
     Attorney General

19
     *s/ Tad Robinson O'Neill*
20   TAD ROBINSON O'NEILL, WSBA #37153
     JULIA K. DOYLE, WSBA #43993
21   SUSANA CROKE, WSBA #58315
     MADELINE DAVIS, WSBA #51261
22   Assistant Attorneys General
     800 Fifth Ave., Suite 2000
23   Seattle, WA 98104-3188
     (206) 464-7744

24

25   *Attorneys for Plaintiff State of Washington*

26

ORDER GRANTING MOTION TO DISMISS
CLAIMS AGAINST PREHRIED LLC,
PREHIRED RECRUITING LLC, PREHIRED
ACCELERATOR LLC, AND KAISHA, LLC
ONLY - 2

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

# EXHIBIT 2

The Honorable Suzanne Parisien
Noted for Consideration: January 12, 2024, at 11:00 a.m.
With Oral Argument

1

2

3

4

5

6

7

**STATE OF WASHINGTON
KING COUNTY SUPERIOR COURT**

8

9  STATE OF WASHINGTON,                    NO. 22-2-08651-3 SEA

Plaintiff,                        ORDER GRANTING STATE'S
10                                          MOTION FOR PARTIAL SUMMARY
v.                                JUDGMENT AGAINST JOSHUA
11                                          JORDAN

12  PREHIRED, LLC, a Delaware limited
liability company;
13  PREHIRED RECRUITING, LLC, a
Delaware limited liability company;
14  PREHIRED RECRUITING, LLC, a
Florida limited liability company;
15  PREHIRED ACCELERATOR, LLC; a
Florida limited liability company;
16  JOSHUA JORDAN, an individual,
KAISHA, LLC, a Wyoming limited
17  liability company; AND ISA PLUS, LLC,
a Delaware limited liability company,

18                    Defendants.

19  _____

AND RELATED CROSS-ACTIONS.
20  _____

21      THIS MATTER, having come before the Court on Plaintiff's Motion for Partial Summary

22  Judgment Against Joshua Jordan, and the Court having heard/oral argument on  Jan. 12, 2024

23  and considered the following material:

24      1. Declarations of Tad Robinson O'Neill, Anton Forbes, David Stewart, and Guadalupe S.

25         Ramos III, and exhibits attached thereto;

26      2. State's Motion for Partial Summary Judgment Against Joshua Jordan;

ORDER GRANTING STATE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
AGAINST JOSHUA JORDAN - 1

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

AE07

3.  Any Opposition or Reply briefs and supporting declarations as well as any other papers or pleadings on file related to the State's Motion for Partial Summary Judgment Against Joshua Jordan; and

4.  The pleadings on file in this matter;

5.  _____; and

6.  _____; and

7.  _____

Having reviewed the above materials, and being familiar with the files and pleadings in this case, the Court hereby rules as follows:

1.  Defendant Joshua Jordan (Jordan) founded, owned, and managed Prehired, LLC (Prehired), Prehired Recruiting, LLC (Prehired Recruiting), and Prehired Accelerator, LLC (Prehired Accelerator). Jordan exercised control over the companies' functions and directed their operations.

2.  Jordan, through Prehired, operated a postsecondary program of training that taught skills or knowledge for the purpose of preparing persons for a vocation. Prehired operated and conducted business in Washington, including by enrolling and entering into financing contracts with Washington students.

3.  Prehired advertised its educational services online, including in Washington, through Prehired's website.

4.  Summary judgment is "appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Michael v. Mosquera-Lacy*, 165 Wn.2d 595, 601, 200 P.3d 695 (2009); CR 56(c). A party may move for summary judgment on all or any part of its claim. CR 56(c). In deciding the motion, the Court may consider filed pleadings, depositions, answers to interrogatories, admissions, and affidavits. *Id.*, *State v. LA Investors, LLC*, 2 Wn. App. 2d 524, 536-7, 410 P.3d 1183 (2018) *review denied* 190 Wn.2d 1023 (2018).

ORDER GRANTING STATE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
AGAINST JOSHUA JORDAN - 2

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**A. Jordan Violated the Private Vocational Schools Act**

5.  Jordan, through Prehired, operated a private vocational school in Washington, as this term is defined in RCW 28C.10.020(7).

6.  At no point was Prehired licensed to operate as a private vocational school in Washington.

7.  Jordan, through Prehired, violated the Private Vocational School Act (PVSA), RCW 26C.10.090, by operating Prehired and conducting business in Washington without a license. Prehired advertised, made offers, solicited, and entered into contracts in Washington without a license as required by RCW 26C.10.

8.  Any violation of the PVSA "affects the public interest and is an unfair or deceptive act or practice in violation of RCW 19.86.020 of the consumer protection act." RCW 28C.10.210; *see also* RCW 28C.10.130.

9.  Prehired enrolled at least 67 Washington consumers.

10. Of these Washington residents, 42 signed tuition financing agreements known as an Income Share Agreement (ISA). An additional 6 students signed only a Membership Success Agreement (MSA). Prehired also enrolled 6 students through Enrollment Agreements.

11. The remaining 13 Washington residents either made payments to Prehired or are recorded in Prehired's financial records as being Washington students.

12. Prehired solicited and advertised to Washington consumers through its website. Washington residents visited Prehired's website at least 17,073 times.

13. Jordan participated in and knowingly approved of all of Prehired's violations of the PVSA and is, therefore, personally liable for each and every violation. *See State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.*, 87 Wn.2d 298, 322, 553 P.2d 423 (1973); *see also Grayson v. Nordic Constr. Co.*, 92 Wn.2d 548, 553-54, 599 P.2d 1271 (1979).

14. Jordan and Prehired's enrolling of 67 Washington consumers violated the PVSA and constitutes 67 distinct violations.

ORDER GRANTING STATE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
AGAINST JOSHUA JORDAN - 3

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

AE09

1    15. Jordan and Prehired's solicitations in Washington violated the PVSA and constitute
2    17,073 distinct violations.

3    **B. Jordan Violated the Consumer Protection Act**

4    16. The Consumer Protection Act (CPA) forbids "unfair and deceptive acts or practices in
5    the conduct of any trade or commerce." RCW 19.86.020.

6    17. Jordan engaged in "trade" or "commerce" within the meaning of the CPA,
7    RCW 19.86.010(2), by advertising, marketing, soliciting business from, and entering into
8    contracts with Washington consumers.

9    18. Jordan, individually, and through Prehired, engaged in unfair and deceptive acts and
10    practices in trade or commerce.

11    19. Through its ISAs, Prehired and Jordan represented to Washington students that their ISAs
12    were not loans or debt.

13    20. At least 40 Washington consumers signed ISAs that stated that they were not loans or
14    credit.

15    21. Prehired also failed to include the required Holder Rule language,
16    *see* 16 C.F.R. § 433.2(a), in its ISAs, including those with 42 Washington consumers.

17    22. These acts and practices are unfair or deceptive pursuant to the CPA.

18    23. Jordan, individually and through Prehired, also misrepresented to consumers that their
19    ISAs were enforceable.

20    24. The PVSA provides that contracts for payment to an unlicensed school are
21    unenforceable. RCW 28C.10.180; *see also* RCW 28C.10.170.

22    25. Because Prehired and Jordan operated an unlicensed private vocational school in
23    Washington, ISAs and other contracts relating to payment for its vocational program with
24    Washingtonians were unenforceable as a matter of law.

25    26. Jordan's actions in seeking to enforce unenforceable obligations were unfair and had the
26    capacity to deceive a significant portion of consumers, and therefore violated the CPA.

ORDER GRANTING STATE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
AGAINST JOSHUA JORDAN - 4

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    27. Jordan caused Prehired and its servicers to make demands and collected at least 175

2    payments from Washington consumers pursuant to the unenforceable ISAs.

3    28. Subsequently, Jordan, on behalf of Prehired Recruiting and Prehired Accelerator,

4    contacted at least 5 Washington consumers to collect on a defaulted ISA by settling the

5    obligation in exchange for level monthly payments and other terms unfavorable to the borrower.

6    29. Jordan's conduct affects the public interest because his actions were committed in the

7    course of his business, demonstrated a pattern of conduct, and harmed numerous consumers. *See*

8    *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn. 2d 778, 789–90, 719

9    P.2d 531, 537–38 (1986) (listing relevant factors).

10   30. Jordan participated in, and knowingly approved of, Prehired's unfair and deceptive acts

11   and practices.

12   31. Jordan's conduct constitutes unfair or deceptive acts or practices and is unlawful under

13   the CPA.

14   32. Jordan and Prehired's misrepresentation of the nature of financial instruments and

15   omission of the Holder Rule language in ISAs with Washington consumers violated the CPA

16   and constitute 82 additional, distinct violations.

17   33. Jordan and Prehired's 175 payments collected on unenforceable ISAs violated the CPA

18   and constitute 175 additional, distinct violations.

19   34. Jordan acts to settle 5 unenforceable ISAs violated the CPA and constitute 5 additional,

20   distinct violations.

21   **C.  Jordan Violated the Collection Agency Act**

22   35. The Collection Agency Act (CAA) prohibits operating as a collection agency or an out-

23   of-state collection agency in Washington without a license. RCW 19.16.110.

24   36. Violations of RCW 19.16.110 are *per se* unfair or deceptive acts or practices in the

25   conduct of trade or commerce under the CPA. RCW 19.16.440. Violation of the licensing

26   requirement in RCW 19.16.110 satisfies the "public interest impact" element of a CPA claim.

ORDER GRANTING STATE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
AGAINST JOSHUA JORDAN - 5

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

AE11

1   *Panag*, 166 Wn.2d at 54.

2     37. At Jordan's direction, Prehired transferred and assigned past due ISAs to Prehired

3   Recruiting and Prehired Accelerator for the express purpose of collection.

4     38. Jordan, Prehired Recruiting, and Prehired Accelerator acted as collection agencies and

5   out-of-state collection agencies as the terms are defined in RCW 19.16.100(4) and (12).

6     39. At no point were Jordan, Prehired Recruiting, or Prehired Accelerator licensed as

7   collection agencies in Washington.

8     40. After the assignment, Jordan, acting on behalf of Prehired Recruiting filed collection

9   actions in Delaware against 6 Washington consumers.

10     41. Likewise, Jordan directed Prehired Recruiting to file arbitration claims against 3

11   Washington consumers.

12     42. Jordan's collection activities violated the CAA and the CPA, and constitute 9 additional,

13   distinct violations.

14   **D. Remedies**

15     43. Imposition of a statutory penalty for each violation of the CPA is mandatory, but

16   determination of the amount of the penalty per violation is discretionary.

17   *State v. Living Essentials, LLC*, 8 Wn. App. 2d 1, 36, 436 P.3d 857 (2019). The Court may

18   consider any relevant factor, including whether a defendant acted in good faith, the injury to the

19   public, elimination of any benefits derived by the defendant from the violation at issue, the

20   necessity of vindicating the authority of the law enforcement agency, and deterrence of future

21   violations. *State v. Mandatory Poster Agency, Inc.*, 199 Wn. App. 506, 526, 398 P.3d 1271

22   (2017); *U.S. v. Reader's Digest Ass'n, Inc.*, 662 F.2d 955 (3rd Cir. 1981).

23     44. The Court finds that Jordan's conduct supports a per-violation penalty of $7,500, which

24   is the statutory maximum under RCW 19.86.140, for each of the 67 Washington consumers that

25   enrolled in Prehired; a per-violation penalty of $10 for each website solicitation in Washington;

26   and a per-violation penalty of $2,500 for each ISA that misrepresented that it was a debt

ORDER GRANTING STATE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
AGAINST JOSHUA JORDAN - 6

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

AE12

1  instrument and/or excluded the required Holder Rule language; a per-violation penalty of $500

2  for each payment collected or settlement on an unenforceable ISAs; and a per-violation penalty

3  of $7,500 for each action taken to collect obligations of Washington consumers without a license.

4  The Court thus finds that total penalties of $1,035,730 should be entered against Jordan, as

5  follows:

| Act or Practice | Penalty Per Violation | Number of Violations | Penalty Amount |
|---|---|---|---|
| Operating in and enrolling students in Washington without a license under the PVSA | $7,500 | 67 | $502,500 |
| Operating and soliciting students in Washington without a license under the PVSA | $10 | 17,073 | $170,730 |
| Misrepresenting nature of financial instruments and omitting Holder Rule language | $2,500 | 80 | $200,000 |
| Receiving payment and settling on unenforceable ISAs | $500 | 180 | $90,000 |
| Collecting debts without a license under the CAA | $7,500 | 9 | $67,500 |
| Total | | 17,411 | $1,030,730.00 |

16  45. The CPA provides that "[t]he court may make such additional orders or judgments as

17  may be necessary to restore to any person in interest any moneys … which may have been

18  acquired by means of any act herein prohibited or declared to be unlawful." RCW 19.86.080(2).

19  46. "An award of prejudgment interest is appropriate where a party retains funds rightly

20  belonging to another party and thereby denies the party the use value of the money."

21  *Arzola v. Name Intelligence, Inc.*, 188 Wn. App. 588, 595, 355 P.3d 286 (2015). "A prevailing

22  party is entitled to prejudgment interest, provided the damages are liquidated." *Id.*

23  47. Here, the amounts Prehired and Jordan collected from consumers are readily

24  ascertainable and liquidated, and as such, Jordan should be ordered to pay prejudgment interest

25  on the restitution it provides to each consumer at a rate of 6% per annum.

26  48. The Court finds that Jordan and Prehired's violations support a restitution award in the

ORDER GRANTING STATE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
AGAINST JOSHUA JORDAN - 7

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1 | amount of $35,925, with prejudgment interest, for Washington consumers who made payments
2 | but did not otherwise sign an ISA, a total of $46,501.76.

3 | 49. Pursuant to the Court's equitable and statutory authority under RCW 19.86.080(1), the
4 | State is entitled to recover the costs of this action including reasonable attorney's fees.

5 | **Therefore, IT IS ORDERED** that the State's Motion for Partial Summary Judgment
6 | Against Jordan is GRANTED.

7 | **IT IS FURTHER ORDERED** that Jordan is personally liable for each and every
8 | violation of the CPA described above.

9 | **IT IS FURTHER ORDERED** that the State is entitled to civil penalties against Jordan
10 | in the amount of $1,035,730.00.

11 | **IT IS FURTHER ORDERED** that the State is entitled to restitution against Jordan in
12 | the amount of $46,501.76.

13 | **IT IS FURTHER ORDERED** that pursuant to RCW 19.86.080(1), the State is entitled
14 | to an award of its reasonable attorneys' fees and costs and shall submit a petition for fees within
15 | 45 days of this order.

16 | DATED this 16th day of January, 2024.

17 |

18 | THE HONORABLE SUZANNE PARISIEN

19 |

20 | Presented by:
    | ROBERT W. FERGUSON
21 | Attorney General

22 | /s/Tad Robinson O'Neill
    | TAD ROBINSON O'NEILL, WSBA #37153
23 | JULIA K. DOYLE, WSBA #43993
    | SUSANA CROKE, WSBA #58315
24 | MADELINE DAVIS, WSBA #51261
    | Assistant Attorneys General
25 | Attorneys for Plaintiff State of Washington

26 |

ORDER GRANTING STATE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
AGAINST JOSHUA JORDAN - 8

# EXHIBIT 3

1
2

The Honorable Suzanne Parisien
Noted for Consideration: April 11, 2024
Without Oral Argument

3
4
5
6
7

## STATE OF WASHINGTON
## KING COUNTY SUPERIOR COURT

8
9   STATE OF WASHINGTON,                                 NO. 22-2-08651-3 SEA

                         Plaintiff,

10                                                        JUDGMENT FOR PLAINTIFF STATE
                                                         OF WASHINGTON AGAINST
11          v.                                           DEFENDANT JOSHUA JORDAN

12   PREHIRED, LLC, a Delaware limited
     liability company;
13   PREHIRED RECRUITING, LLC, a
     Delaware limited liability company;                 **[CLERK'S ACTION REQUESTED]**
14   PREHIRED RECRUITING, LLC, a
     Florida limited liability company;
15   PREHIRED ACCELERATOR, LLC; a
     Florida limited liability company;
16   JOSHUA JORDAN, an individual,
     KAISHA, LLC, a Wyoming limited
17   liability company; AND ISA PLUS, LLC,
     a Delaware limited liability company,

18                         Defendants.

19   _____

20   AND RELATED CROSS-ACTIONS.

21                      **I.    JUDGMENT SUMMARY**

22          1.1    Judgment Creditor                     State of Washington

23          1.2    Judgment Debtor                       Joshua Jordan

24          1.3    Total Judgment Amount                 $1,435,546.28

25                 a) Costs and Fees                         $358,314.52

26                 b) Consumer Restitution                   $46,501.76

JUDGMENT FOR PLAINTIFF STATE OF
WASHINGTON AGAINST DEFENDANT
JOSHUA JORDAN  - 1

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

AE16

|  |  |  |
|---|---|---|
|  | c) Civil Penalties | $1,030,730.00 |
| 1.4 | Post Judgment Interest Rate: | 12 percent per annum |
| 1.5 | Attorneys for Judgment Creditor: | Susana Croke<br>Madeline Davis<br>Julia Doyle<br>Assistant Attorney(s) General |
| 1.6 | Attorney for Judgment Debtor: | Kyle Berti |

## II.    FINAL JUDGMENT

Based on the Court's Order Granting State's Motion for Partial Summary Judgment Against Joshua Jordan, dated January 16, 2024 (Dkt. 203), Order Granting State's Motion for Permanent Injunction, dated March 1, 2024 (Dkt. 251), and Order Granting Plaintiff State of Washington's Motion for Fees and Costs, dated April 1, 2024 (Dkt. 258), which are all incorporated by reference as if fully set forth herein, the Court finds and rules that:

2.1    Defendant Joshua Jordan (Jordan) violated the Private Vocational School Act (PVSA), RCW 28C.10.090, by operating a private vocational school in Washington without a license. Dkt. 203 ¶ 7. Jordan's private vocational school, Prehired, LLC (Prehired) enrolled at least 67 Washington consumers. *Id.* ¶ 9. Prehired solicited and advertised to Washington consumers through its website, which was viewed by Washingtonians at least 17,073 times. *Id.* at 12. Jordan participated in and knowingly approved of all of Prehired's violations of the PVSA and is personally liable for every violation. *Id.* ¶ 13. Jordan's violations of the PVSA affect the public interest and are unfair or deceptive acts or practices in violation of the Consumer Protection Act (CPA), RCW 19.86.020. *Id.* ¶ 8.

2.2    Jordan engaged in trade or commerce within the meaning of the CPA, RCW 19.86.010(2), by advertising, marketing, soliciting business from, and entering into contracts with Washington consumers. Dkt. 203 ¶ 17. Jordan, individually and through Prehired, engaged in unfair or deceptive acts or practices in trade or commerce in violation of the CPA by representing to 80 Washington consumers that their Income Share Agreements (ISA) were not

JUDGMENT FOR PLAINTIFF STATE OF
WASHINGTON AGAINST DEFENDANT
JOSHUA JORDAN  - 2

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  loans or debt; failing to include the required Holder Rule language in those ISAs;

2  misrepresenting that ISAs were enforceable; and seeking to enforce, settle, and collect upon 180

3  unenforceable obligations. *Id.* ¶¶ 18-28. Jordan's conduct affected the public interest because his

4  actions were committed in the course of his business, demonstrated a pattern of conduct, and

5  harmed numerous consumers. *Id.* ¶ 29. Jordan participated in, and knowingly approved of,

6  Prehired's unfair and deceptive acts and practices in violation of the CPA, and he is personally

7  liable for every violation. *Id.* ¶ 30.

8      2.3     Jordan violated the Collection Agency Act (CAA), RCW 19.16.110, when

9  Prehired, at Jordan's direction, transferred and assigned past due ISAs to Jordan's other entities,

10 Prehired Recruiting, LLC and Prehired Accelerator, LLC (Prehired Entities) for the purpose of

11 collection, and then acted as collection agencies and out of state collection agencies without a

12 license as the terms are defined in RCW 19.16.100. Dkt. 203 ¶¶ 37-39. Jordan and the Prehired

13 Entities filed collection or arbitration actions against 9 Washington consumers. *Id.* ¶¶ 40-41.

14 These violations of the CAA also constitute per se violations of the CPA. *Id.* ¶ 36.

15     2.4     **Restitution:** Pursuant to RCW 19.86.080(2), Jordan is liable for, and is ordered

16 to pay $46,501.76. Dkt. 203 ¶ 48. This amount includes restitution and prejudgment interest at

17 6 percent per annum to the affected Washington consumers. Dkt. 203 ¶ 47.

18     2.5     **Civil Penalties:** Pursuant to RCW 19.86.140, Jordan is liable for, and is ordered

19 to pay, civil penalties to the State in the amount of $1,030,730.00. Dkt. 203 ¶ 44.

20     2.6     **Attorneys' Fees and Costs:** Pursuant to RCW 19.86.080, the State is the

21 prevailing party in this action and is entitled to an award of costs and fees. Jordan is liable for,

22 and is ordered to pay, the State's attorney fees in the amount of $346,250.65 and costs in the

23 amount of $12,063.87. Dkt. 258.

24     2.7     **Post Judgment Interest:** Jordan is liable for post judgment interest in the amount

25 of 12 percent per annum. RCW 4.56.110(6); RCW 19.52.020(1).

26

JUDGMENT FOR PLAINTIFF STATE OF
WASHINGTON AGAINST DEFENDANT
JOSHUA JORDAN  - 3

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

AE18

1    2.8    **Injunction:** Pursuant to RCW 19.86.080, RCW 28C.10.190, RCW 19.16.460,

2 the Court orders an injunction against Jordan, as detailed below.

3 IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED as follows:

4      The Court hereby enters a monetary final judgment in favor of the State, whose last

5 known address is 800 Fifth Avenue, Suite 2000, Seattle, Washington 98104 and against Jordan,

6 whose last known address is 3306 South Omar Avenue, Tampa, FL 33629-7639, in the amount

7 of $1,435,546.28, which amount shall accrue post judgment interest in the amount of 12 percent

8 per annum as per RCW 4.56.110(6) and RCW 19.52.020(1) **all for which let execution issue**.

9      Furthermore, pursuant to RCW 19.86.080, RCW 28C.10.190, and RCW 19.16.460, the

10 Court rules that Jordan and his officers, agents, servants, employees, attorneys, and other persons

11 in active concert or participation with them are hereby PERMANENTLY RESTRAINED and

12 ENJOINED from the following:

13      a.   Conducting business of any kind, making any offers, advertising or soliciting, or

14         entering into any contracts in Washington without a private vocational school license

15         as required by RCW 28C.10.090;

16      b.   Filing or pursuing any legal actions or arbitrations to enforce contracts with any

17         Washington residents relating to payment for any program offered or provided by

18         Jordan. For purposes of this stipulation, the term "Washington resident" means any

19         person currently residing in Washington, or any person who was a resident of

20         Washington at the time they signed the contract at issue;

21      c.   Collecting or attempting to collect any payments on contracts with any Washington

22         resident relating to payment for any program offered or provided by Jordan;

23      d.   Selling, assigning, or otherwise transferring any interest or purported interest in any

24         contracts with any Washington residents relating to payment for any program offered

25         or provided by Jordan to any third party; and

26

JUDGMENT FOR PLAINTIFF STATE OF
WASHINGTON AGAINST DEFENDANT
JOSHUA JORDAN  - 4

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   e. Making any attempt to compromise any claims purportedly arising from any

2    contracts with any Washington resident relating to payment for any program offered

3    or provided by Jordan.

4   Jordan should provide a copy of this injunction to any other person or entity who has

5 acquired any interest from Jordan in any contract with a Washington resident relating to payment

6 for any program offered or provided by Jordan.

7       **III. PAYMENT AND ENFORCEMENT**

8   3.1  Payment of civil penalties and attorneys' fees and costs under this Judgment shall

9 be made in full immediately in the form of a valid check paid to the order of the "Attorney

10 General—State of Washington." Payment shall be sent to the Office of the Attorney General,

11 Attention: Margaret Farmer, Litigation Support Manager, 800 Fifth Avenue, Suite 2000, Seattle,

12 Washington 98104-3188.

13   3.2  Nothing in this Judgment shall be construed as to limit or bar any other

14 governmental entity or any consumer in the pursuit of other remedies against Jordan.

15 Representatives of the Washington State Office of the Attorney General shall be permitted, upon

16 reasonable notice to Jordan, to access and inspect all business records or documents under

17 Jordan's control to monitor compliance with the terms of this Judgment. Violation of any of the

18 injunctive terms contained in this Judgment, as determined by the Court, shall subject Jordan to

19 a civil penalty of up to $125,000 per violation pursuant to RCW 19.86.140.

20

21   ENTERED this 12th day of April, 2024.

22

23

24           THE HONORABLE SUZANNE PARISIEN

25

26

JUDGMENT FOR PLAINTIFF STATE OF
WASHINGTON AGAINST DEFENDANT
JOSHUA JORDAN  - 5

1  Presented by:

2  ROBERT W. FERGUSON
3  Attorney General

4  */s/ Madeline Davis*
   SUSANA CROKE, WSBA #58315
5  MADELINE DAVIS, WSBA #51261
   JULIA DOYLE, WSBA #43993
6  Assistant Attorneys General
7  Attorneys for Plaintiff State of Washington
   800 Fifth Avenue, Suite 2000
8  Seattle, WA 98104
   (206) 464-7744
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

JUDGMENT FOR PLAINTIFF STATE OF
WASHINGTON AGAINST DEFENDANT
JOSHUA JORDAN - 6

AE21

# EXHIBIT 4

See Case No.: 1:22-bk-11007 (JTD)

Adv. Proc. No. 23-50438 (JTD)

Docket No. 211

# EXHIBIT 5

1

## *ASSIGNMENT of CLAIMS*

This ASSIGNMENT OF CLAIMS ("Agreement") which is made effective on 06/25/2022 ("Effective Date"), by and between Prehired, a Delaware Limited Liability Company ("Assignor"), and Joshua Jordan, an individual residing in Charleston, South Carolina ("Assignee") (together the Assignor and Assignee are the "Party" or "Parties"), in consideration of the mutual covenants herein contained and other good and valuable consideration, the sufficiency of which is hereby acknowledged, witnesseth:

WHEREAS, the Parties hired and retained the services of Warren Law Group ("WLG") starting on or about October 25, 2021 for various matters including but not limited to defending the Parties in various investigations and lawsuits where the Parties have a $2 million insurance policy to pay for their defense and are concerned WLG may be acting with negligence and/or in its own interest by doing whatever generates the most billable hours instead of acting in the best interest of the Parties;

WHEREAS, the Assignor started a Directors & Officers insurance policy on 09/30/2021 with the insurer being Clear Blue Specialty Insurance and the broker of record being Embroker Insurance with the coverage naming the Assignee as beneficiary and protected from personal liability (the "Policy");

WHEREAS, on June 8, 2022, notwithstanding the expressed satisfaction at the Parties' compliance with the prior investigation, the State of Washington ("WAAG") filed a complaint against the Assignor and Assignee. The WAAG's filing occurred in disregard of the evidence and discovery (and lack thereof), featuring numerous statements that were not only intellectually dishonest but were predominantly fictional, fabricated, and deceitful throughout the entire complaint, which led the Parties to believe this lawsuit is entirely politically motivated and/or the result of rampant corruption in the AG's office. The ongoing actions of the WAAG have caused immediate and irreparable damage to the Parties' wellbeing, livelihood, property, income, and reputation and is likely future actions of the WAAG will continue to cause irreparable harm;

NOW THEREFORE, Assignor and Assignee agree as follows:

1. Parties hereby agree that the Assignor shall assign to the Assignee all its right, title, and interest in all monies, payments, claims, actions, causes of action, demands and damages related to WLG, the Policy, and the WAAG, both known or unknown, past, present, and future (the "Claim"). This assignment excludes all obligations and liabilities associated with the Claim because it is an assignment without assumption of liabilities.

2. Assignee hereby accepts the assignment of all of Assignor's right, title, and interest in the Claim. This assignment excludes all obligations and liabilities associated with the Claim because it is an assignment without assumption of liabilities.

AE24

2

3. For good and valuable consideration, the Assignee receives the Claim in exchange for the amount of $25,000.00. The Assignee shall make payment by reducing the 2022 annual salary paid by Assignor to $25,000.00. In 2021, the Assignee received approximately $50,000.00 in salary, which would value this consideration at $25,000.00. As long as no more than $25,000.00 in W2 salary is paid to Assignee by Assignor in 2022, the payment will be considered made in full on the Effective Date of this Agreement.

4. Assignor agrees to defend and indemnify the Assignee from any and all problems and expenses, past, present, and future, related to this Agreement.

5. This Agreement may be assigned to another party by the Assignee.

6. Prehired Accelerator, LLC and Prehired Recruiting, LLC both acknowledge the Assignor and Assignee are the only parties who have potential rights, title, and interest in said Claim and acknowledge the assignment of the Claim to the Assignee.

7. If any provision or clause in this Agreement will be held to be invalid or unenforceable for any reason, the remaining provisions or clauses will continue to be valid and enforceable.

8. This Agreement shall be governed and construed in accordance with the law of the state of Wyoming without regard to its conflicts of laws rules. Any actions, suits, or proceedings related to this Agreement shall only be heard in the federal and state courts located within the state of Wyoming, and the parties expressly consent to the personal jurisdiction of these courts.

9. All parties acknowledge this Agreement will become fully executed upon signing.

<SIGNATURE PAGE FOLLOWS>

AE25

3

**Assignor:**

By: _____

Name: Joshua Jordan

In his capacity as CEO of the Assignor

**Assignee:**

By: _____

Name: Joshua Jordan

In his capacity as himself individually

SWORN TO AND SUBSCRIBED before me on this ___25___ day of ___June 2022___.

_____
Christopher Briggman
Notary Public



AE26

# EXHIBIT 6

# EMPLOYMENT CONTRACT

This employment agreement ("Agreement") is made and effective as of 01/01/2018 by and between Prehired, LLC ("Employer") having its principal place of business at 1650 Indy Drive, N Charleston, South Carolina 29405, and Joshua Jordan ("Employee") with a mailing address of 1650 Indy Drive, N Charleston, South Carolina 29405. The sign date below is dated one year after the effective date, making this contract retroactive and forward looking.

WHEREAS the Employer intends to hire the Employee for the position of Chief Executive Officer and the Employee desires to provide their services on the conditions set forth.

IN CONSIDERATION of promises and other good and valuable consideration the parties agree to the following:

**I. Employee Duties.** The Employee agrees that they will act in accordance with this Agreement and with the best interests of the Employer in mind, which may or may not require them to present the best of their skills, experience, and talents, to perform all the duties required of the position. In carrying out the duties and responsibilities of their position, the Employee agrees to adhere to any and all policies, procedures, rules, regulations, as administered by the Employer.

**II. Responsibilities.** The Employee shall be given the job title of Chief Executive Officer ("Position") which shall involve but not limited to managing the business and operations to the best of their skills, experience, and talents. The Employer may also assign duties to the Employee from time to time by the Employer.

**III. Employment Period.** The Employer agrees to hire the Employee as At-Will. At-Will means this Agreement may be terminated at any time by either the Employee or Employer. After termination by any of the Parties, neither will have any obligation other than the non-disclosure of the Employer's proprietary information as outlined in Section XII and any non-compete listed in Section XIII.

**IV. Pay.** As compensation for the services provided, the Employee shall be paid forty-eight thousand dollars ($48,000.00) **salary on an annual basis** ("Compensation"). The Compensation is a gross amount that is subject to all local, State, Federal, and any other taxes and deductions as prescribed by law. Payment shall be distributed to the Employee on a monthly, quarterly, or yearly basis, as chosen by the Employee.

**V. Indemnification.** The Employer agrees to defend and indemnify the Employee from any and all claims, losses, damages, reasonable expenses, including attorneys' fees, as it relates to this agreement.

**VI. Expenses.** The Employer agrees to reimburse the Employee for any expenses related to responsibilities.

**VII. Ownership Interest.** This Agreement shall not include ownership in the business operations of the Employer.

**VIII. Trial Period.** There is no trial period.

**IX. Vacation Time.** The Employee is entitled to unlimited paid vacation time.

**X. Personal Leave.** The Employee is entitled to unlimited paid personal leave off.

**XI. Federal Holidays.** The Employee shall be entitled to all federal holidays per calendar year.

**XII. Confidentiality.** There shall be no confidentiality established in this Agreement.

**XIII. Non-Compete.** There shall be no Non-Compete established in this Agreement.

**XIV. Employee's Role.** The Employee shall have the right to act in the capacity of the Employer. This includes, but is not limited to, making written or verbal agreements with any customer, client, affiliate, vendor, or third (3rd) party.

AE28

**XV. Appearance.** The Employee may appear at the Employer's desired workplace at the time scheduled.

**XVI. Disability.** If for any reason the Employee cannot perform their duties, by physical or mental disability, the Employer may terminate this Agreement by giving the Employee written notice.

**XVII. Compliance.** The Employee agrees to adhere to all sections of this Agreement in addition to any rules, regulations, or conduct standards of the Employer including obeying all local and federal laws. If the Employee does not adhere to this Agreement, company policies, including any task or obligation that is related to the responsibilities of their position, the Employer may terminate this Agreement without severance as stated in Section III.

**XVIII. Return of Property.** The Employee agrees to return any and all property of the Employer upon the termination of employment. This includes, but is not limited to, equipment, electronics, records, access, notes, data, tests, vehicles, reports, models, or any property that is requested by the Employer.

**XIX. Notices.** All notices that are to be sent under this Agreement shall be done in writing.

**XX. Amendments.** This Agreement may be modified or amended under the condition that any such amendment is attached and authorized by all parties.

**XXI. Severability.** This Agreement shall remain in effect in the event a section or provision is unenforceable or invalid. All remaining sections and provisions shall be deemed legally binding unless a court rules that any such provision or section is invalid or unenforceable, thus, limiting the effect of another provision or section. In such case, the affected provision or section shall be enforced as so limited.

**XXII. Waiver of Contractual Right.** If the Employer or Employee fails to enforce a provision or section of this Agreement, it shall not be determined as a waiver or limitation. Either party shall remain the right to enforce and compel the compliance of this Agreement to its fullest extent.

**XXIII. Governing Law.** This Agreement shall be governed under the laws in the State of South Carolina.

**XXIV. Entire Agreement.** This Agreement, along with any attachments or addendums, represents the entire agreement between the parties. Therefore, this Agreement supersedes any prior agreements, promises, conditions, or understandings between the Employer and Employee.

EMPLOYER

Date  1/1/2019

Signature

Joshue Jordan

Print Name

Managing member

Title

EMPLOYEE

Date  1/1/2019

Signature

Joshue Jordan

Print Name

CEO

Position

# EXHIBIT 7

6/10/24, 6:52 PM                                     Gmail - FW: DRAFT Motion to Continue Trial

 Gmail

Josh Jordan <joshlegalstuff@gmail.com>

## FW: DRAFT Motion to Continue Trial

**Kyle Berti** <Kyle@bertilaw.com>                                    Fri, Feb 23, 2024 at 5:52 PM
To: "Joshua Jordan (Work)" <joshlegalstuff@gmail.com>

See below.

Kyle Berti
The Law Office of Kyle Berti, P.L.L.C.
Phone: 564-202-2326
Web: www.bertilaw.com
Email: kyle@bertilaw.com



CONFIDENTIALITY NOTICE: This communication may contain information which is privileged, confidential,
and/or protected by the attorney-client or attorney work product privileges. If you are not the intended
addressee, note that any disclosure, copying, distribution, or use of the contents of this message is
prohibited. If you have received this communication in error, please destroy it and notify me immediately at
the address above.

---

**From:** Croke, Susana (ATG) <susana.croke@atg.wa.gov>
**Date:** Friday, February 23, 2024 at 11:57 AM
**To:** Kyle Berti <Kyle@bertilaw.com>, Davis, Maddie (ATG) <maddie.davis@atg.wa.gov>, Doyle,
Julie (ATG) <julie.doyle@atg.wa.gov>
**Cc:** Val Greenup <val@bertilaw.com>, Hehemann, Matt (ATG) <matt.hehemann@atg.wa.gov>,
Clark, Serina (ATG) <serina.clark@atg.wa.gov>
**Subject:** RE: DRAFT Motion to Continue Trial

Kyle,

Thank you for sharing this. We cannot stipulate to a continuance based on this. The Court already found
your client <u>personally</u> liable, under the CPA, for <u>personally and directly</u> participating in the unlawful acts.
*See* Dkt. 203 at 3 ("Jordan participated in and knowingly approved of all of Prehired's violations of the
PVSA and is, therefore, personally liable for each and every violation. *See State v. Ralph Williams' N.W.
Chrysler Plymouth, Inc.*, 87 Wn.2d 298, 322, 553 P.2d 423 (1973); *see also Grayson v. Nordic Constr. Co.*,
92 Wn.2d 548, 553-54, 599 P.2d 1271 (1979)."); Dkt. 203 at 4 ("Jordan, individually, and through Prehired,
engaged in unfair and deceptive acts and practices in trade or commerce."); Dkt. 203 at 8 ("IT IS FURTHER
ORDERED that Jordan is personally liable for each and every violation of the CPA described above.").  Any
release of liability in your client's capacity of assignee of Prehired is irrelevant. The Stipulated Judgement,
by its terms, releases assigns of *Prehired's* liability. That is standard language in settlement. You are arguing
that it absolves *Jordan* of his *personal* liability. Nothing in the Stipulated Judgment or your assignment
supports that conclusion.

**Susana Croke** (*she/her*)

Assistant Attorney General

O: (206) 464-6098

C: (206) 670-2774

**From:** Kyle Berti <Kyle@bertilaw.com>
**Sent:** Friday, February 23, 2024 9:20 AM
**To:** Davis, Maddie (ATG) <maddie.davis@atg.wa.gov>; Doyle, Julie (ATG) <julie.doyle@atg.wa.gov>; Croke, Susana (ATG) <susana.croke@atg.wa.gov>
**Cc:** Val Greenup <val@bertilaw.com>; Hehemann, Matt (ATG) <matt.hehemann@atg.wa.gov>
**Subject:** DRAFT Motion to Continue Trial

[EXTERNAL]

Hi all,

Attached to this email is the "assignment" that we have been discussing. In my declaration is the notary's phone number. And to emphasize here, I believe that a continuance is necessary for further time for us to discuss and determine the applicability of this document, as well as (if necessary) brief the issue with the court. I didn't prepare a proposed order yet because I wanted to get input from you first.

Kyle Berti
The Law Office of Kyle Berti, P.L.L.C.
Phone: 564-202-2326
Web: www.bertilaw.com
Email: kyle@bertilaw.com



CONFIDENTIALITY NOTICE: This communication may contain information which is privileged, confidential, and/or protected by the attorney-client or attorney work product privileges. If you are not the intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this communication in error, please destroy it and notify me immediately at the address above.

# EXHIBIT 8

*PRIVILEGED AND CONFIDENTIAL COMMUNICATION*
*PURSUANT TO DEL. R. EVID. 408;*
*FOR SETTLEMENT PURPOSES ONLY*

## MEMORANDUM

| | |
|---|---|
| TO: | Katherine Devanney, Deputy Attorney General, Delaware Department of Justice |
| FROM: | David Rosenfield; Jorge Marquez; Chris Warren |
| CC: | Josh Jordan |
| RE: | Prehired, LLC and Mr. Jordan's Narrative to Delaware Department of Justice |
| DATE: | July 22, 2022 |

### I.    Introduction

To date, the Delaware Department of Justice ("DOJ") has only heard or considered one version of the events leading up to its investigation of Prehired, LLC ("Prehired"). The purpose of this document is to present a fair and equivalent narrative that establishes, (a) Prehired, LLC ("Prehired") is a beneficial, viable company that helps the great majority of its members achieve the economic and career success that they otherwise would not achieve, and (b) its founder and CEO, Joshua Jordan is a caring and charitable businessman who has spent the better part of the last decade doing the hard work to build Prehired from the ground up, often at the expense of time with his family and financial interests.

### II.    Josh's Background, Church Involvement, Charitable Work, and Early Career

Josh, who is 36, grew up in a loving family with three brothers. His father has run a customer-based business installing home alarm systems business in the Charleston, South Carolina area for more than 40 years. Josh's father included Josh in the family business and taught Josh and his brothers to work hard, always be honorable in their acts, and treat their customers well.



*Josh with his father and 3 brothers.*

1

*PRIVILEGED AND CONFIDENTIAL COMMUNICATION*
*PURSUANT TO DEL. R. EVID. 408;*
*FOR SETTLEMENT PURPOSES ONLY*

Josh's work ethic, leadership qualities, and desire for community service developed very early in his life. In his senior year of high school, Josh was elected the student body president and was voted by his peers to be the most valuable player after being chosen as captain of the high school football team. Josh then attended North Carolina State University (NCSU), where he volunteered 5 to 10 hours each week at his church and worked at ADT, helping customers across the country customize home security solutions. In his last two years at NCSU (before earning a business degree in 2008), Josh learned Japanese and planned to move to Japan to teach English and engage in missionary and community service work with his church.

From 2009 until 2013, Josh lived in Japan, teaching English and working as a partner of the American Chamber of Commerce in Japan. During this time, his mentor had him meet with the Prime Minister of New Zealand, Sir John Key, because of Josh's exceptional service to the community.



*Josh with New Zealand Prime Minister Sir John Key.*

While teaching on a salary of about $30,000 (meager income for living in Tokyo), Josh also volunteered over 20+ hours a week at his church, Lifehouse Church, located in Tokyo and Yokohama. Even while on a teacher's salary, he contributed 10% of his income to Lifehouse

*PRIVILEGED AND CONFIDENTIAL COMMUNICATION*
*PURSUANT TO DEL. R. EVID. 408;*
*FOR SETTLEMENT PURPOSES ONLY*

Church to help support the underprivileged community the church served. In fact, Josh has contributed about 10% of his income to charities since he was 18. As mentioned above, Josh was raised to always help others whenever he can, and he has done so his entire life.

While in Japan, Josh was fortunate enough to meet his partner, Royce. Josh and Royce got married, moved back to the United States in 2014, now have three young children, and live in the Charleston area where Josh and his family grew up.



*Josh and Royce in Japan.*

*PRIVILEGED AND CONFIDENTIAL COMMUNICATION*
*PURSUANT TO DEL. R. EVID. 408;*
*FOR SETTLEMENT PURPOSES ONLY*



*Josh with his wife, son (Liam, left), and daughter (Rae, right).*

Days after Josh's brother Paul died in January 2021 from brain cancer at age 26, Josh's third child was born. Josh and Royce honored Paul by naming their newborn son Noah Paul.

They celebrated their 10th wedding anniversary this year (April 2022). Josh works full-time so Royce can be a full-time mom. Josh and Royce also support Royce's family in the Philippines, as well as other underprivileged individuals in the Philippines, by helping them pay for living expenses.

*PRIVILEGED AND CONFIDENTIAL COMMUNICATION*
*PURSUANT TO DEL. R. EVID. 408;*
*FOR SETTLEMENT PURPOSES ONLY*



*Josh s brother Paul and newborn son Noah Paul.*

During the last years of his brother's life, Josh paid for many of Paul's living expenses, so he would not have to worry about working and paying bills while battling his deadly form of brain cancer.

### III.   Josh Moves Back to the U.S. and Later Starts Prehired, LLC

As mentioned above, in 2014, Josh moved back to the United States and volunteered to assist a tech startup company in competing for a $100,000 grand prize in an investment competition called "Rise of the Rest," that was hosted by AOL co-founder and CEO Steve Case. The company which Josh assisted won the $100,000 grand prize.

*PRIVILEGED AND CONFIDENTIAL COMMUNICATION*
*PURSUANT TO DEL. R. EVID. 408;*
*FOR SETTLEMENT PURPOSES ONLY*



*Josh Jordan (right), with the Bidr team, holding the $100,000 grand prize check.*

After Josh moved back to Charleston, he became a sales manager at a startup software company. Josh worked diligently to make the company successful until suddenly, and without warning, the CEO told him that the company was winding up and closing. Josh was devastated.

After several months of considering his next move and career prospects, Josh got inspired to jump back into software sales. Josh spent many months and tens of thousands of dollars from his savings studying several of the world's top sales systems. As Josh reviewed these sales systems, he noticed their strengths and flaws, especially for the systems selling software. Josh also wondered why software sales teams struggled to hire people with sales talent and skills. Through Josh's tech-saavy intelligence, understanding of the software industry, leadership skills, and desire to impact the community in a meaningful and positive way, he developed a training system. The nascent system that would eventually become Prehired would build and develop individuals in dead-end careers to shape positive skillsets and bring out their innate natural talents to propel them towards success in software sales. Josh wanted to help others learn how to help themselves.

*PRIVILEGED AND CONFIDENTIAL COMMUNICATION*
*PURSUANT TO DEL. R. EVID. 408;*
*FOR SETTLEMENT PURPOSES ONLY*

In October 2017, Josh launched Prehired. While developing the program, Josh interviewed dozens of software sales managers, giving him new insights and allowing him to specifically tailor his program to the best ways to sell software for these companies: companies that would eventually rely on Josh to provide trained and skilled salespeople. Josh then included his insights in his step-by-step Science-Based Sales® system, on which Prehired successfully trains its members.

After turning away hundreds of potential Prehired members who either could not pay Prehired's fees in cash or qualify for a third-party loan, Josh introduced Income Share Agreements ("ISAs") in May 2019, not so that Prehired could earn extra profits, but rather, so that members would not have to pay any money to Prehired until after they were hired. This was a change in Josh's business model at his own risk; he would not get paid unless his program was successful in coaching others so that they could earn a high-paying sales position. As noted on Prehired's website:

> "**High Reward, Low Risk**
>
> Our mission is to help ordinary people learn Science-Based Sales® and high-paying tech sales jobs. With that in mind, we don't want payment to stop you from succeeding in our workforce accelerator.
>
> That's why we're proud to offer <u>Income Share Agreements (ISAs)</u>, letting you start paying after you earn your first paycheck."

(emphasis in original)

## IV.    Meratas, Leif, and Introduction of ISA to Prehired's Business

Josh was introduced to ISAs by Meratas and Leif (two ISA servicers). Prehired sold almost every ISA to ISA funding companies, usually at a 50% discount or greater, retaining only a limited number of ISAs. Josh relied substantially upon ISA servicer Meratas for advice and consultation concerning ISAs, their operation, and structure. The CEO of Meratas, Darius Goldman (a licensed attorney), represented that he knew the ISA field very well and received advice from other professionals such as a former CFPB enforcement attorney, then in private practice. This attorney gave Josh legal advice, taking Josh on as a client in 2020. Crucially, in Josh's mind, ISAs were a means by which individuals could pay for Prehired's services and significantly improve their employment prospects because traditional loans or cash payments were not an option for almost all Prehired members. Finally, it was not Prehired but, rather, the ISA funders such as ISA Plus, Blair, and Mia-Share – some of which, upon information and belief, work with hedge funds – who sold the ISAs to Prehired's members and packaged them as valid debt instruments.

Moreover, Prehired's members receive one-on-one mentoring to learn the coursework and assistance with job applications, interviews, and salary negotiations.

*PRIVILEGED AND CONFIDENTIAL COMMUNICATION*
*PURSUANT TO DEL. R. EVID. 408;*
*FOR SETTLEMENT PURPOSES ONLY*

Early in the pandemic (April 2020), Prehired helped several members get rehired after losing previous jobs. Josh also sent an email to its members, warning them not to take bad jobs out of fear.

In December 2020, Josh started the WePay Foundation ("WePay") (www.wepaybills.org) to help people in need pay their bills using some of Prehired's profits. Because WePay did not have its 501c3 status approved yet, Prehired itself donated $2,500 to a Charleston church because Josh wanted to start giving as soon as possible. The funds were used to help sponsor a Thanksgiving fair in November 2021, through Radiant Church (https://www.radiantchurch.com/).

Josh helped feed over 200 people by giving away whole frozen turkeys and bags full of groceries to people in need. There were also service providers at the event for adults, jump castles and face painting for kids. Unfortunately, because of the number of delinquent members, Prehired was never able to fund WePay to help pay the bills for the many families in need. The lawsuits and settlements initiated by Prehired in 2022 were supposed to, among other things, enable Prehired to fund WePay.

In January 2021, Prehired added a significant course update which included:

- The psychology of how sales managers and prospects think, to cater to both.

- Several new walkthrough videos on specific tools, like LeadIQ for more quickly finding hiring managers' contact info, and Outplay to more easily send them email sequences for tracking responses and video tools.

- More insights and instructions for making well done, personalized brand videos to show a member's value to hiring managers.

- A detailed framework for sales emails with do's and don'ts, sample email walkthroughs and effective subject lines.

- Cold call scripts, breakdowns, objection handling and sample cold calls.

- How to reject a job offer politely.

*PRIVILEGED AND CONFIDENTIAL COMMUNICATION*
*PURSUANT TO DEL. R. EVID. 408;*
*FOR SETTLEMENT PURPOSES ONLY*

In March 2021, Prehired started a new program, "Prehired Promoted," to assist Prehired members who had been hired to increase their chances of promotion. This program is included in Prehired's lifetime membership at no extra cost to members.

In April 2022, based upon feedback from members, Prehired's next major course update went live, and it involved modifying each module so that members would receive hands-on practice and could not complete the program until their work met Prehired's standards. Prehired's team worked on this update for several months.

Although Prehired is proud of having accomplished these key updates, they by no means represent all the continuous program updates made to better the experience of all Prehired members.

## V.    Prehired Testimonials

Prehired has collected over 900 positive testimonials about its services, and some 400 are posted on Prehired's website. Significantly, there is no requirement in Prehired's Membership Agreement that requires members to post a positive review. And the only "reward" for posting a positive review was a Prehired t-shirt (which was given regardless if someone actually left a review because Prehired wasn't checking). Prehired encourages its members to provide any negative feedback or suggestions for improvement directly to Prehired so that the company can address these concerns, which it does if these concerns have merit.

    A. Themes in the Testimonials

      1. Before Prehired

- Underpaid and struggling to pay bills

  - Some had a big life change (new babies, divorces, etc.), so they needed to earn more.

  - Others, who were working in sales, didn't have consistent income because they had no base pay.

  - During the pandemic, many weren't allowed to work for long periods, so they lost income.

- Overworked

  - Often more than 40 hours per week.

*PRIVILEGED AND CONFIDENTIAL COMMUNICATION*
*PURSUANT TO DEL. R. EVID. 408;*
*FOR SETTLEMENT PURPOSES ONLY*

- o Exhausted from working weekends, nights, and holidays.

- o Ever-changing schedules, particularly retail and food service.

- o Little time with family and friends.

- o Having to take on more work for the same pay (this was common during the pandemic, especially in service industries).

- No or low growth prospects

  - o No way to earn more.

  - o No way to learn more.

  - o Couldn't afford the time or money to go back to college.

- Disrespected

  - o Bosses and/or co-workers didn't treat them well.

  - o Family and friends didn't see them as achieving much.

- Lack of job security (a big worry during the pandemic)

  - o Worried about losing their job.

  - o Worried about their industry not faring well.

- Lack of awareness of the opportunities in tech sales careers

  - o Thought they needed a 4-year degree to work in tech.

  - o Thought they needed to be an engineer or hardcore "techie" to work in tech.

  - o Didn't realize so many tech companies needed salespeople.

  - o Didn't realize tech salespeople can earn as good an income as many on the technical side of the companies.

In contrast, what their lives were like after Prehired.

2. <u>After Prehired</u>

*PRIVILEGED AND CONFIDENTIAL COMMUNICATION*
*PURSUANT TO DEL. R. EVID. 408;*
*FOR SETTLEMENT PURPOSES ONLY*

- Excited about much higher income.

- Excited to have a more consistent income (because of the base pay).

- Excited to work regular 40-hour weeks.

- Excited for the opportunity to work at a tech company.

- Excited for career growth potential (to get promoted to Account Executive, or even higher, and to keep learning and earning more).

- Many say they couldn't have done it without Prehired.

B. Selected Testimonials

The attached 30+ page summary, which includes a number of selected very positive testimonials about how Prehired changed members lives in terms of their employment, says it all. These are, without question, glowing, heartfelt reviews:

- "**Prehired changed my life. No two ways about it. It's worth every minute and every penny if you show up and put in the work**. I still refer to my course notes almost every day at work. **The biggest value is knowing I have such a great and supportive network behind me at all times**." (emphasis added) (Lou Scinta)

  o Lou is blind, which made choosing his career path difficult. With a wife and two children to support, Lou became a salesman, selling web designs and then chemical products. When Lou joined Prehired, he hoped Prehired could help him earn enough extra money to buy a large vehicle for his family and guide dog, and a house in five years. Lou was hired at MuniBilling, did very well, and in April 2022 was promoted to Account Executive.

- "Hey Prehired fam! I am accepting a position with GoTo software sales as a BDR… In just a few short weeks I finished the program and after just my 2nd software sales interview, **I landed with a great company and will be accepting their offer tomorrow!... the team at Prehired is there to see you through to landing your dream job. I did. And so can you**." (emphasis added) (Ryan Bean)

11

AE44

*PRIVILEGED AND CONFIDENTIAL COMMUNICATION*
*PURSUANT TO DEL. R. EVID. 408;*
*FOR SETTLEMENT PURPOSES ONLY*

- o Ryan, who has a wife and young family, didn't want his work to be as all-consuming or risky as it had been. He had worked as a commercial fisherman in Alaska and on a solar farm 1½ hours from his home. Ready for a change, but not having a college degree, Ryan had to think twice about sales, because he, like many others, are put off by salesmen. But Ryan saw software sales differently, as a means to help businesses solve problems. Just 13 weeks after joining Prehired, Ryan landed a great job offer.

- "I got hired at Demandforce! Start date Nov. 2nd... @Thomas Jansen (Prehired Staff) for giving me that 1 golden ticket on why I want to do Software Sales! **@Josh for making dreams come true with the PreHired SBS training! Here's getting my foot in the door with no previous experience, just a dream and dedication is all it took :-) Thanks to all the PreHired staff**..." (emphasis added) (Joseph Mayfield)

  - o Before Prehired, Joseph was doing manual labor (laying asphalt and bricks, fixing a sump pump) at a cannabis dispensary. With a partner and 9-year-old daughter to support, as he told Prehired, Joseph needed to increase his compensation, while at the same time reducing his hours and commute time. Moreover, he only had a two-year associate degree. Joseph recalled the time he went door-to-door selling Cutco knives and that he enjoyed selling, but he wanted to make more money without the grind. The job he obtained after joining Prehired gave him that opportunity, even though it took him longer than most to land a tech sales job after starting at Prehired (20 weeks vs. the 12-week average).

- "I wanted to share that I'll be starting my SDR career on Monday! I got hired over at Arrow and I'm excited to be a part of something that is changing the way we sell... **You guys created a phenomenal community where I didn't feel alone in this journey, i'll be forever grateful!** Trust the process, with hard work and dedication you can do whatever you desire." (emphasis added) (London Fobbs)

  - o London wanted to break into the tech industry but didn't want to write code and wasn't an engineer. After obtaining her college degree in English, she began working at retail stores, but then the pandemic hit, and she had to rethink her career

*PRIVILEGED AND CONFIDENTIAL COMMUNICATION*
*PURSUANT TO DEL. R. EVID. 408;*
*FOR SETTLEMENT PURPOSES ONLY*

path. That's when she found Prehired. She completed Prehired's program (all while traveling in an RV) and eight weeks after starting, she signed a job offer.

- "Before I joined PreHired, I was an uber driver for about a year and a REALTOR for just over a year… and it was tough…

  I wanted to find a company where I could grow and eventually (6-14 months) make six-figures a year in sales so that I could begin to build my life and consistently invest.

  **PreHired helped me become an expert in the sales process and lead generation. And, using my pH sales system I reached out to 11 (I only had to contact 11!) companies and 38% responded and booked… AND got a job offer in less than 10 days! Now I'm working as an SDR at an awesome tech company (Panoply) remotely!**

  **Thanks to Josh and Prehired, this process was extremely seamless for me. I was able to go from start to finish in 4 weeks. These tips, tricks & training are extremely valuable.**

  If you're looking to make a change and pursue a lucrative career, or you're wanting to start your journey but also learn valuable career and life skills, check out preHIRED and Tech Sales!

  Feel Free to reach out to me if you have any questions!" (emphasis added) (Ajay Williams)

  o Ajay was an uber driver and a real estate agent before joining Prehired. He didn't have a consistent income and was tired of working hard but not making more than $50,000/yr. Ajay wanted to find a company where he could grow and eventually make six figures a year in tech sales. After joining Prehired, it took him less than five weeks to find a tech sales job.

**VI.   Prehired's Qualities**

13

*PRIVILEGED AND CONFIDENTIAL COMMUNICATION*
*PURSUANT TO DEL. R. EVID. 408;*
*FOR SETTLEMENT PURPOSES ONLY*

A.  Diversity and Inclusiveness

Prehired is proud of the diverse nature of its members, noting on its website:

> "**Not Just White Guys**
>
> While other training companies talk about diversity, we deliver it. More than two thirds of our members come from underrepresented groups.
>
> We believe sales teams should look like the customer base they serve, which means true diversity – of race, religion, beliefs, and more.
>
> This is about more than checking boxes. It's about building the foundation for growth, and attracting the best talent."

In fact, Prehired has helped many underprivileged, diverse individuals, and even some disabled individuals, secure tech sales jobs, and is open to:

- Anyone aged 18+, with no upper age limit.

- Individuals of all colors.

- Military veterans, who are often discriminated against by employers because they lack specific experience, because of worries about their mental health, or other stereotypes.

- Individuals with no college degree, who employers routinely filter out.

- Individuals who work full-time.

- Individuals who can't attend hours per week of live training.

- Individuals who've not been working for a long time (like moms coming back into the workforce).

- Individuals with criminal records.

14

AE47

*PRIVILEGED AND CONFIDENTIAL COMMUNICATION
PURSUANT TO DEL. R. EVID. 408;
FOR SETTLEMENT PURPOSES ONLY*

- Individuals with physical disabilities. This includes Lou Scinta, the blind man mentioned above.

B.   Award-Winning Training; Endorsements

As noted on Prehired's website, Prehired's program is not simply successful, it is "Award-Winning":

> **"Our Training is Award-Winning**
>
> Prehired is the only tech sales career launch program to be in Hubspot's top sales training programs list 3 years in a row.
>
> We're also Career Karma's Top Tech Sales Bootcamp plus a Preferred Partner. (And yes, while our career launch program is like a bootcamp, it's just the start of your lifetime membership benefits.)"
>
> (emphasis in original) Both Hubspot and Career Karma are well-known and well-respected companies. Hubspot is a Customer Relationship Management (CRM) marketing and sales platform, and Career Karma is a top destination for career advice.

In the "Frequently Answered Questions" section of Prehired's website, the subsection entitled "Who Else Endorses Your Training Program" provides, in pertinent part, as follows:

> "CareerKarma named us the top tech sales career launch program                for                2020.
>
> HubSpot named our Science-Based Sales® system (which you learn in our program) to its Top 27 list of sales trainings for 2018, 2019 and 2020. We are the only software sales career     training     program     on     the     list.
>
> SalesHacker, the largest sales community online, named our founder, Josh Jordan, to their Top 10 list for Sales Leadership out of 5,000+ people nominated for the award worldwide.
>
> Billion-dollar sales engagement platform company, Outreach.io, is also a fan. They've recruited several of our members and praised us on their Sales Engagement Podcast interview with our founder, Josh Jordan (which is ranked in

*PRIVILEGED AND CONFIDENTIAL COMMUNICATION*
*PURSUANT TO DEL. R. EVID. 408;*
*FOR SETTLEMENT PURPOSES ONLY*

> their       top       10       most       popular       episodes)…
>
> Another billion-dollar software company, Drift (the first conversational marketing platform), also <u>partnered with us to hire our members to fuel their growth.</u>
>
> We're also backed by a financial institution that only supports university programs and other trainings proven to boost members' income afterward. They told us upfront they'd rejected ALL the other sales training programs who applied, since they couldn't prove their members made more money after the training. They backed us only after nearly two months of intensive research on our training & member success."

(emphasis in original)

C.  Lifetime Membership Benefits

As also noted on Prehired's website:

**"You Also Get These Perks for Life...**

- **Access to other members who want to help each other learn, discover new job opportunities and share their experiences working at hundreds of companies.**

- Content updates so you always know the latest tools, skills and workflows

- **Live trainings with our staff, members and other industry insiders**

- 1:1 mentoring for tailored guidance given your situation

- **Job opportunities with our growing partner company network**

- Job references from your mentors"

(emphasis in original)

D.  Reaction of Some Prehired Members to Actions Taken in AG Cases

Three Washington residents recently entered into settlement agreements with Prehired pursuant to which, in exchange for a standard monthly payment, they would receive a reduced

*PRIVILEGED AND CONFIDENTIAL COMMUNICATION*
*PURSUANT TO DEL. R. EVID. 408;*
*FOR SETTLEMENT PURPOSES ONLY*

total ISA amount, and Prehired would continue to work with them to help them find a job in software sales. Following the entry of a Stipulated Preliminary Injunction in the Washington AG's case, in which Prehired agreed to cease all activities in Washington, two of these three individuals complained to Prehired about the settlement because they wanted to keep working with Prehired and continue the terms of their settlement agreements.

Additionally, after learning about the Iowa AG's investigation of Prehired, two Iowa members contacted Prehired because they wanted to make sure they could continue to work with the company.

### E.  Prehired Has Data to Back-Up Its Claims

Prehired has at least some data to back-up each of the claims of success included on its website, such as the following, which are referenced in the Delaware AG's July 7, 2022, subpoena to Prehired:

- "Prehired members are HIRED in 12 weeks on average."

- "After 12 weeks, Prehired members average $69,000 in their first year with 6-figure potential after that."

- "> 90% of Prehired members are hired within 6 months."

- "[W]hile making 6 figures is NOT average for year 1, it's common in year 2 onward."

### F.  Collections Only When Necessary

When some Prehired members defaulted on their obligations, Prehired didn't pursue collections for months and for some, even years. Josh reviewed the files of all the members who had defaulted and determined that many either weren't responsive, refused to complete the work they were required to do or argued and failed to cooperate when ISA servicers or Prehired reached out. Additionally, almost 100 Prehired members who found employment in tech sales after completing Prehired's program simply refused to pay the amounts due under their ISAs. Accordingly, Josh decided that it simply wasn't fair to the members honoring their commitments to let others default and disappear.

Josh never had to make a decision like this in his life, and never thought he would have to. But he realized that as CEO, after he had provided delinquent customers with significant grace periods and an opportunity to correct their actions, it was still his duty to enforce the rules against members who did not act reasonably. These delinquent, non-paying customers prohibited Prehired from lowering prices because the paying customers were essentially subsidizing non-payers, and that was not right or fair to the community. The defaults also were not fair to Prehired's staff, most

*PRIVILEGED AND CONFIDENTIAL COMMUNICATION*
*PURSUANT TO DEL. R. EVID. 408;*
*FOR SETTLEMENT PURPOSES ONLY*

of whom had given up working in tech sales, where they could have made more money. Josh wanted to give them raises but couldn't afford to because of the defaults. Thus, Josh felt he had no choice but to pursue debt collection efforts against those who either didn't try or didn't cooperate.

> G. <u>Members were not Arbitrarily Kicked Out and Cancellation Periods were Extended</u>

If an individual happened to violate Prehired's Code of Conduct, Prehired did *not* automatically "kick" those members out and require them to pay Prehired's fee. Rather, Prehired considered several factors, including repeated violations of Prehired's Code of Conduct, as bearing on the decision whether to remove someone from the program.

Prehired's Membership Agreement includes the following cancellation and refund policy:

- **Cancelation Period (<u>YES</u> REFUND)**
  You have the right to cancel this Agreement, without any penalty or obligation, and obtain a full refund of your Membership Dues or cancelation of your ISA if you cancel within **seven days after your Member Start Date** (the "Cancelation Period") **and** you've completed **no more than thirty percent (30%) of the Online Program Content.**

- **Withdrawal After Cancelation Period (<u>NO</u> REFUND)**
  YOU ARE GIVEN A 7 DAY / 30% COMPLETION "RISK FREE" TRIAL PERIOD WHERE YOU CAN TRY OUT PREHIRED, AND MAY CANCEL YOUR MEMBERSHIP AT NO CHARGE IF YOU CHOOSE THIS IS NOT FOR YOU. AFTER THIS PERIOD, YOU WILL BE OBLIGATED TO EITHER PAY THE CASH-OPTION... OR THE ISA-OPTION, EVEN IF YOU CHOOSE NOT TO SEEK EMPLOYMENT AS AN SDR OR EVEN IF YOU CHOOSE NOT TO COMPLETE THE PROGRAM.

(emphasis in original)

Nevertheless, when Josh saw members who were consistently doing their required work yet were struggling, he made exceptions to the cancellation rules and, as a result, he has released over 400 members from their contracts, almost all of whom were long past the 7-day and 30% coursework limits for cancellations.

**VII.  <u>Conclusion</u>**

*PRIVILEGED AND CONFIDENTIAL COMMUNICATION*
*PURSUANT TO DEL. R. EVID. 408;*
*FOR SETTLEMENT PURPOSES ONLY*

We believe that Prehired has a strong, persuasive, factually, and evidence-based narrative which counter many of the claims against the company in the investigations by the various state AG's offices and financial regulators. Further, throughout Joshua Jordan's entire adult life, he has consistently served and supported the communities he has lived in through his actions. Accordingly, we ask that, as part of the DOJ's investigation, it consider this narrative.