Joshua Jordan, admitted Pro Se
6650 Rivers Ave, STE 100
Charleston, SC, 29406
Tel: 843.790.3989
joshlegalstuff@gmail.com

RECEIVED

2024 JUL 19 PM 12: 43

CLERK
U.S. BANKRUPTCY COURT
DELAWARE

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>Prehired, LLC, et al,<br><br>    Debtors | Chapter 7<br><br>Case No.: 1:22-bk-11007 (JTD)<br><br>Adv. Proc. No. 23-50438 (JTD)<br><br>**JORDAN'S REPLY TO THE STATE OF WASHINGTON'S RESPONSE TO THE MOTION TO ENFORCE THE FINAL JUDGMENT AND ORDER** |

Intervenor Joshua Jordan ("Jordan"), pro se, hereby submits this Reply to the State of Washington's Response [Dkt No. 224] (the "Response") to Jordan's Motion to Enforce the Final Judgment and Order [Dkt No. 222] (the "Motion" or "Original Motion"). In support of this Reply, Jordan states as follows:

## I. INTRODUCTION

The State of Washington's ("State" or "AGO" or "Washington State Attorney General's Office") Response mischaracterizes the nature of Jordan's claims and the scope of this Court's authority to interpret and enforce its own orders. While the State raises procedural concerns, it notably does not substantially refute the underlying facts or merits of Jordan's claims.

To address the State's procedural concerns, which seem to be their primary focus - perhaps because they found little substantive ground to stand on - Jordan hereby formally withdraws his request

for a declaratory judgment. It's almost amusing how much ink the State spilled on procedural matters while remaining conspicuously silent on the core issues at hand. Nevertheless, to clear the procedural issue raised, Jordan is prepared to proceed without an adversary proceeding and focus on the Court's interpretation and enforcement of its own Order. This modification allows the Court to address the substantive issues at hand without the procedural complications that so captivated the State's attention. Specifically, Jordan hereby amends his request for declaratory judgment and instead asks the Court to:

1. Interpret the Order to clarify that Jordan is included as a released party;

2. Direct the State of Washington to file a motion in the Washington state court to vacate the judgment against Jordan pursuant to Washington Civil Rule 60(b)(6);

3. Order the State of Washington to stipulate, jointly with Jordan, to the vacatur of the judgment in the Washington state court based on this Court's interpretation of the Order.

Jordan maintains all other requests for relief as outlined in the Original Motion.

## II. THE COURT HAS JURISDICTION TO INTERPRET AND ENFORCE ITS OWN ORDER

The State erroneously argues that this Court lacks jurisdiction to grant the relief requested in the Motion. In addition to the Order containing language stating that this court shall maintain jurisdiction as it relates to the Order multiple times (Docket No. 211-2), it is well-established that bankruptcy courts have the authority to interpret and enforce their own orders. See Travelers Indem. Co. v. Bailey, 557 U.S. 137, 151 (2009) ("The Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders."). This principle is fundamental to the efficient administration of bankruptcy cases and the integrity of the bankruptcy process. Jordan is not asking this Court to overturn the state court judgment. Rather, he is seeking an interpretation and enforcement of this Court's Order [Case No. 22-11007, Docket No. 211-2], which predates the state court proceedings. The Supreme Court has held that a bankruptcy court retains jurisdiction to enforce its own orders, even when doing so may conflict with another court's subsequent judgment. See Local Loan Co. v. Hunt, 292 U.S. 234, 239 (1934).

Moreover, the Third Circuit has recognized that bankruptcy courts have "broad authority to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of' the Bankruptcy Code." In re Combustion Eng'g, Inc., 391 F.3d 190, 235 (3d Cir. 2004) (quoting 11 U.S.C. § 105(a)). This authority includes the power to interpret and enforce prior orders to ensure their proper implementation.

This Court has recently reaffirmed its authority to interpret and enforce its own orders in Opioid Master Disbursement Tr. II v. Covidien Unlimited Co. (In re Mallinckrodt PLC), 20-12522 (JTD) (Bankr. D. Del. Jan. 18, 2024). In that decision, this Court cited In re Energy Future Holdings Corp., 648 B.R. 277 (Bankr. D. Del. 2020), which held that 'a bankruptcy court plainly has jurisdiction to interpret and enforce its own prior orders.' This precedent directly supports Jordan's position that this Court has the authority to interpret and enforce the Order at issue in this case.

The Supreme Court's recent decision in Loper Bright Enterprises v. Raimondo, 603 U.S. ___ (2024), while addressing a different context, reinforces key principles relevant to this case. The Court emphasized the judiciary's fundamental role in interpreting the law, the importance of adhering to plain meaning and intent, and the need for skepticism towards self-serving interpretations by government entities. These principles support this Court's authority and duty to interpret its own Order according to its plain meaning, rather than deferring to the State of Washington's self-serving interpretation. Just as the Supreme Court rejected excessive deference to agency interpretations, this Court should reject the State's attempt to reinterpret the Order in a manner that contradicts its clear language and intent.

Furthermore, the State's actions following this Court's Order raise serious concerns about its compliance and good faith. The timeline of events is particularly troubling and merits close scrutiny:

- On November 2, 2023, this Court issued the Order based on the stipulated settlement agreement drafted and signed by the State's representative, Assistant Attorney General Tad O'Neill. This Order clearly released both the Prehired entities and Mr. Jordan. (See Docket No. 211-2)

- Despite this Order, on December 15, 2023 - a mere six weeks later - the State, represented by the same Mr. O'Neill, filed a Motion for Summary Judgment in King County Superior Court against both the Prehired entities and Mr. Jordan personally. (See Exhibit B: 2023.12.15 Washington AGO's Motion for Summary Judgment Against Prehired Entities and Jordan Personally)
- This motion was scheduled for hearing on January 12, 2024.
- On January 10, 2024, just two days before the scheduled hearing, the State suddenly scheduled a hearing to dismiss only the Prehired entities.
- On January 11, 2024, the court dismissed the Prehired entities. (See Exhibit C: 2024.01.11 Order dismissing Prehired Entities)
- On January 12, 2024, the summary judgment hearing proceeded, but only against Mr. Jordan personally.

The State's actions are particularly egregious given the clear language of the Order. The Order defines 'Prehired Defendants' to include 'successors and assigns' [Case No. 22-11007, Docket No. 211-2, ¶ 29(k)]. As an assignee, Jordan is unequivocally included in this definition. Every instance of 'Prehired Defendants' in the Order can be read as including Jordan. Thus, when the Order releases the Prehired Defendants, it explicitly releases Jordan. The State's attempt to pursue claims against Jordan while dismissing claims against other Prehired entities is a direct violation of the Order's plain language.

The egregious nature of the State's actions is further underscored by the fact that Assistant Attorney General Tad O'Neill, the very individual who represented the State in this Court and drafted the settlement agreement which became the Order, subsequently filed a motion for summary judgment in Washington State court. This motion, filed a mere six weeks after this Court's Order, sought judgment against Prehired, LLC, Prehired Recruiting, LLC, Prehired Accelerator, LLC, and Mr. Jordan personally. Mr. O'Neill's actions demonstrate a flagrant disregard for this Court's Order, which explicitly released these parties. That the same attorney who negotiated and signed the Order in this Court would then actively violate it in another jurisdiction is not merely troubling—it is a direct affront to the authority of this Court and the integrity of the judicial process. **None of these facts are being denied by the State.**

This sequence of events strongly suggests that the State of Washington is attempting to "double dip" - first by securing federal funds through the Order issued by this Court as stated by the State in the

adversary hearing (Adversary Proceeding No. 23-50438-JTD, Docket No. 11 [audio file]), and then **once the court granted the Order, the State proceeds to intentionally and directly defies the Order by pursuing millions of dollars from the Prehired entities and Mr. Jordan personally in its own state court just six weeks later.** **Jordan's counsel even attempted multiple times to inform the State of this fact but they chose again to disregard warnings by his Washington counsel (Original Motion Exhibit 5).** <u>**This conduct is not merely questionable; it appears to be a direct violation of this Court's Order and continuation of the Washington Court's assessment of the State's "egregious and serious" conduct that is "intentional" and "without excuse".**</u> (See Exhibit A, p. 9, para. 22).

It is crucial to emphasize that this Court ordered the release of both the Prehired entities and Mr. Jordan. Yet, instead of complying with this Order, the State of Washington, through Mr. O'Neill - the very person who drafted and signed the settlement agreement - proceeded to file a motion for summary judgment in its own courts. This was not a concurrent action but a deliberate move made six weeks after this Court issued its Order. Then, approximately four weeks later and just one day before the hearing, Mr. O'Neill asked the state court to dismiss only the Prehired entities, intentionally excluding Mr. Jordan from this dismissal.

As Judge Ryan astutely observed in his critique of the Washington Attorney General's Office, this behavior can only be described as "egregious, serious, and without excuse." (See Exhibit A, p. 9, para. 22). Indeed, Judge Ryan's characterization seems particularly apt in light of these actions, which demonstrate a pattern of conduct that appears designed to circumvent this Court's Order and pursue financial gain at Mr. Jordan's expense.

This Court not only has the jurisdiction but also the duty to interpret and enforce its own Order in light of these circumstances. The State's actions threaten the integrity of this Court's orders and the bankruptcy process as a whole. As such, this Court's intervention is necessary to prevent the State from using procedural maneuvering to circumvent the clear intent and language of the Order it helped craft and from which it has already benefited. To allow such conduct to stand unchallenged would

undermine the authority of this Court and the principles of justice upon which our legal system is founded.

## III. THE ROOKER-FELDMAN DOCTRINE DOES NOT BAR THIS COURT'S JURISDICTION

The State's invocation of the Rooker-Feldman doctrine is misplaced. The doctrine is a narrow jurisdictional bar that applies only in "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005).

Here, Jordan is not seeking review or rejection of the state court judgment. Instead, he is asking this Court to interpret and enforce its own prior order, which is well within the Court's jurisdiction. The Supreme Court has cautioned against an expansive interpretation of Rooker-Feldman, noting that the doctrine has sometimes been construed to "extend far beyond the contours of the Rooker and Feldman cases." Lance v. Dennis, 546 U.S. 459, 464 (2006). Specifically since the Washington state court final judgment was not issue until April 12, 2024 and the Order in this court was issued in November 2023.

Furthermore, the Third Circuit has held that Rooker-Feldman does not apply when the federal plaintiff asserts a claim that is independent of the state-court judgment. See Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 167 (3d Cir. 2010). Jordan's claim for enforcement of this Court's Order is independent of the state court judgment and predates that judgment.

## IV. JORDAN IS A RELEASED PARTY UNDER THE ORDER

The State's argument that Jordan is not a released party under the Order is contrary to the plain language of the Order and fundamental principles of contract interpretation. The Order defines "Prehired Defendants" to include "successors and assigns" [Case No. 22-11007, Docket No. 211-2, ¶ 29(k)]. Jordan, as an assignee of Prehired under the Assignment Agreement [Dkt No. 222, Ex. 5], falls squarely within this definition.

It is crucial to understand the full implications of the Order's definition of 'Prehired Defendants'. The Order states that 'Prehired Defendants' includes 'successors and assigns' [Case No. 22-11007, Docket No. 211-2, ¶ 29(k)]. As an assignee of Prehired under the Assignment Agreement [Dkt No. 222, Ex. 5], Jordan is, by definition, a 'Prehired Defendant'. This means that wherever the Order refers to 'Prehired Defendants', it includes Jordan. Therefore, when the Order states that 'Prehired Defendants are forever released of everything that could have been brought and was brought at that time', it explicitly means that Joshua Jordan is released fully. This is not a matter of interpretation, but a direct application of the Order's own definitions.

The Supreme Court has held that "[i]n a bankruptcy case, the court must look to the underlying substantive law governing the claims to determine if they have been discharged." Frenville Co. v. M. Frenville Co. (In re M. Frenville Co.), 744 F.2d 332, 337 (3d Cir. 1984). Here, the underlying substantive law is contract interpretation, and the plain language of the Order includes assignees within its release.

Moreover, the principle of contra proferentem dictates that any ambiguity in the Order should be construed against its drafter, which in this case is the State. See Intel Corp. v. VIA Techs., Inc., 319 F.3d 1357, 1363 (Fed. Cir. 2003) ("When a contract is ambiguous, the principle of contra proferentem dictates that the ambiguity should be interpreted against the drafter.").

## V. JORDAN'S INDIVIDUAL LIABILITY IS DERIVATIVE OF PREHIRED'S LIABILITY

The State's attempt to distinguish Jordan's individual liability from Prehired's liability is without merit. The Washington court's findings of liability were expressly predicated on Jordan acting "through Prehired" [D.I. 222, Ex. 3, at AE18]. This language clearly indicates that Jordan's liability is derivative of Prehired's liability.

The Supreme Court has recognized that in certain circumstances, a release of an entity may also release individuals whose liability is entirely derivative. See Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 342-48 (1971). Here, the release of Prehired in the Order necessarily encompasses Jordan, whose alleged liability stems entirely from his actions on behalf of Prehired.

## VI. THE STATE'S THREE-DECADE HISTORY OF MISCONDUCT: A CHALLENGE TO CREDIBILITY ACCORDING TO ITS OWN COURTS

The State of Washington's silence regarding its role in drafting the Order (Settlement Agreement which became a final order) speaks volumes. This omission undermines the State's attempts to reinterpret the Order in a manner inconsistent with its plain language, and raises serious questions about the State's credibility in these proceedings. More alarming, however, is the Washington State Attorney General's Office ("AGO") long-standing pattern of misconduct, recently brought to light by the King County Superior Court (and in the appellate courts years earlier). On March 21, 2023, Judge Michael K. Ryan issued a scathing order that reveals a **systemic issue plaguing the State AGO for nearly thirty years**:

> *"[T]he AGO, and DSHS specifically, have been sanctioned for similar discovery conduct in the past. Evidently, despite the judiciary's best efforts, neither the AGO nor DSHS have learned their lesson when it comes to complying with their discovery obligations. The AGO has been called out by the Court of Appeals. The situation at present is little more than a continuation of conduct that has plagued the AGO and DSHS for nearly thirty years."* (See Exhibit A p. 7 para 19)

This stark condemnation by a Washington State court is not merely criticism; it is an indictment of the AGO's operational integrity. In the case before Judge Ryan, the AGO's misconduct reached "egregious and serious" levels, including the State's **intentional withholding** of over 10,000 pages of relevant documents.

> *"The discovery violations in this case are egregious, serious, without excuse and the result of willful disregard of discovery obligations by the AGO. Punitive sanctions are warranted."* (See Exhibit A p. 9 para 22)

The court's response severe rebuke was only the beginning:

*"The court imposed substantial sanctions, including a $200,000 punitive sanction, finding that the AGO's conduct was 'tantamount to an intentional act because [it] fall[s] so far below what the Civil Rules and [Washington case law] requires."* (See Exhibit A p. 3 para 7)

Judge Ryan didn't stop at punitive measures. Recognizing the profound impact of the AGO's actions, he also ordered the AGO to pay the plaintiff's attorney fees and costs associated with multiple motions. This dual approach of punitive and compensatory sanctions underscores the gravity of the AGO's misconduct and sets a compelling precedent for addressing such behavior. **This just happened last year… and is an ongoing pattern for almost 30 years according <u>not</u> to Mr Jordan, but according to the <u>State's own courts</u>.**

The AGO's disregard for legal process and truth, as highlighted by the King County Superior Court, is mirrored in the present case. Paragraph 13 of the Original Motion and its accompanying Exhibit 5 document Jordan's counsel's attempts to inform the State that Jordan was a released party under the Order. The State's dismissal of this crucial information aligns perfectly with the pattern of misconduct identified by Judge Ryan, further reinforcing concerns about the AGO's integrity and its willingness to disregard clear legal obligations.

Importantly, Jordan's concerns about the AGO's conduct were not retrospective. In the Assignment Agreement dated June 25, 2022 [Original Motion's Exhibit 5, page AE 24], Jordan explicitly expressed his apprehensions about the AGO's integrity. The subsequent findings by Judge Ryan serve to validate these concerns, demonstrating Jordan's prescience in identifying the AGO's problematic behavior.

This documented history of litigation misconduct by the AGO is not merely background information; it is directly relevant to the current proceedings. It casts a long shadow over the credibility of the AGO's arguments and its interpretation of the Order in this case. The AGO's attempt to narrow

the scope of the release it drafted should be viewed not just with skepticism, but with grave concern, given this thirty-year history of improper conduct.

Moreover, the context surrounding the AGO's motivations is troubling. In the hearing for Adversary Proceeding No. 23-50438-JTD, Docket No. 11 (audio file), the primary reason for seeking to have the Settlement Agreement entered as a final judgment and order was so that the State could gain access to federal funds to pay itself and other government entities for their lawsuit against the Prehired entities and Jordan. This self-serving motivation, combined with the AGO's documented history of misconduct, strongly suggests an attempt to manipulate the judicial process for its own benefit, at the expense of justice and fairness.

In light of this disturbing history, this Court must approach the AGO's arguments with extreme caution. The AGO's interpretation of an order that it drafted, particularly when that interpretation contradicts the plain language of the order and appears to serve the AGO's interests at the expense of other parties, should be viewed with the utmost skepticism.

## B. The State's Conduct in This Case Mirrors Its Past Misconduct

The State's actions in this case bear a striking resemblance to the misconduct recently condemned by its own courts in King County. In that instance, the State violated local rules and discovery obligations, actions which Judge Ryan found to be intentional and 'egregious, serious, and without excuse.' (See Exhibit A, p. 9, para. 22). In the present case, the State has escalated its misconduct by intentionally disobeying a direct order from this Court.

The parallels are clear: Instead of releasing both the Prehired entities and Mr. Jordan as required by this Court's Order, the State chose to file a motion for summary judgment in Washington state court a mere six weeks after this Court's Order was issued. Then, just days before the hearing, they dismissed only the Prehired entities while proceeding against Mr. Jordan, ultimately securing a multi-million dollar judgment against him personally.

This conduct strongly suggests that the State is attempting to profit doubly from this situation: first by securing federal funds through this Court's Order, and then by pursuing millions from Mr. Jordan personally in state court. While the exact amount the State has received or expects to receive from federal funds is unclear, it is likely substantial given the scale of this litigation, and given Mr Jordan spent over $2 million dollars in this litigation leaving him with less than $100 to his name as of this filing. This raises serious questions about the State's motivations and the proportionality of its actions.

The disparity between the actual damages allegedly suffered by victims in Washington (potentially tens of thousands of dollars) and the millions the State stands to gain in legal fees and judgments is stark. It appears the State has managed to create a case that should never have proceeded, and is now profiting handsomely from it despite being in clear violation of this Court's Order.

This pattern of behavior - fabricating work, pursuing unjustified litigation, and profiting from it regardless of the merits or legality - is precisely the kind of conduct that Judge Ryan criticized so strongly. It represents a continuation of the 'egregious' and 'serious' misconduct that has plagued the AGO for nearly three decades, according to their own courts. (See Exhibit A, p. 7, para. 19).

The State's willful disregard for this Court's Order, coupled with its apparent attempt to double-dip financially, demands this Court's intervention. It is crucial that this Court enforce its Order to prevent the State from benefiting from its own misconduct and to uphold the integrity of the judicial process.

## C. The Intentional Nature of the State's Actions

The State's conduct was not merely negligent but intentional and calculated. The sequence of events reveals a disturbing pattern of bad faith:

1. The State drafted the Order, including the broad release language.
2. The State sought this Court's approval of the Order, emphasizing its importance for accessing federal funds.
3. Mere weeks later, on December 15, 2023, the State filed for summary judgment against both the Prehired entities and Jordan personally in state court, in direct violation of this Court's Order.

4. On January 10, 2024, just two days before the scheduled hearing, the State suddenly moved to dismiss only the Prehired entities.
5. On January 11, 2024, the state court dismissed the Prehired entities.
6. On January 12, 2024, the summary judgment hearing proceeded, but only against Jordan personally.

## VII. PUNITIVE DAMAGES AND SANCTIONS

On July 14, 2024, Jordan discovered a March 21, 2023 order from King County Superior Court that reveals a systemic issue plaguing the State AGO for nearly thirty years. Judge Ryan noted that "neither the AGO nor DSHS have learned their lesson when it comes to complying with their discovery obligations" (Exhibit A, p. 7, para 19). This newly discovered evidence directly addresses the AGO's credibility and good faith, which are central to interpreting and enforcing the Order at issue.

In light of the State's egregious conduct as detailed in the motion and this reply, Jordan believes that significant punitive damages and sanctions are warranted. While the original motion did not specify an amount, in addition to compensatory damages, King County Superior Court demanded the State pay $200,000 in punitive damages for a pattern of similar intentional misconduct in its own courts (although arguably this conduct is more severe because it violates a direct order as opposed to the rules of discovery).

And given the State's blatant violation of this Court's Order, as evidenced by their filing of summary judgment motions against both the Prehired entities and Jordan personally after agreeing to their release, Jordan respectfully submits that an even larger amount may be necessary to deter future misconduct. The fact that a $200,000 sanction imposed by their own state court last year did not prevent the AGO from violating this Court's Order suggests that more substantial measures may be required.

Moreover, the Court should consider that Jordan's request for punitive damages extends beyond his personal capacity. As evidenced by the Assignment Agreement submitted with the original motion [Dkt No. 222, Ex. 5], Jordan has been assigned all claims against the State not just for himself personally, but also for the Prehired entities, including Prehired, LLC, Prehired Accelerator, LLC, and

Prehired Recruiting, LLC. This assignment gives Jordan the right to seek damages on behalf of all these entities. Given that the State's violation of the Order affected not just Jordan personally but all the Prehired entities, the Court may consider awarding damages for each of these parties. This approach would more accurately reflect the full scope of the State's violation and provide a more comprehensive deterrent against future misconduct.

Jordan leaves the determination of an appropriate amount to the Court's discretion, but suggests that a punitive damage award of up to $1,000,000 may be necessary to ensure the State's compliance with court orders and to deter future violations. This amount reflects the severity of the State's actions, the fact that Jordan has spent approximately $2.25 million dollars in legal fees, and the pattern of misconduct identified by their own courts, and the need for a sanction substantial enough to impact the behavior of a state agency.

## VIII. PUNITIVE DAMAGES ARE NECESSARY AND JUSTIFIED

The egregious nature of the State's conduct in this case, coupled with its documented history of misconduct, necessitates significant punitive damages. Such damages are not only warranted but crucial to deter future violations and uphold the integrity of this Court's orders.

### A. The State's Actions Fit a Broader Pattern of Misconduct

As evidenced by Judge Ryan's March 21, 2023 order, the AGO has engaged in a pattern of misconduct spanning nearly three decades (Exhibit A, p. 7, para 19). The State's blatant violation of this Court's Order is a continuation of this alarming pattern, demonstrating a systemic disregard for legal obligations and court orders.

### B. Significant Punitive Damages are Necessary for Deterrence

The $200,000 punitive sanction imposed by the King County Superior Court has clearly been insufficient to deter the AGO's misconduct. In this case, the State's actions - drafting an Order, having it approved by this Court, and then willfully violating it weeks later - represent an escalation of their

improper conduct. This Court must send a strong message that such behavior will not be tolerated. A substantial punitive damage award, potentially up to $1,000,000, is necessary to capture the State's attention and effect real change in its practices.

## C. The Intentional Nature of the State's Actions

The State's conduct was not merely negligent but intentional and calculated. Consider the sequence of events:

1. The State drafted the Order, including the broad release language.
2. The State sought this Court's approval of the Order, emphasizing its importance for accessing federal funds.
3. Mere weeks later, the State filed for summary judgment against both Prehired entities and Jordan personally in state court.
4. On the eve of the summary judgment hearing, the State dismissed only the Prehired entities, purposefully excluding Jordan.

This calculated maneuvering demonstrates a willful intent to circumvent this Court's Order. The State's last-minute dismissal of the Prehired entities, while continuing to pursue Jordan, shows a deliberate attempt to cherry-pick which parts of this Court's Order to follow. Such conduct is not only a violation of the Order but also a direct affront to this Court's authority.

Moreover, this sequence of events suggests the State was fully aware of the binding nature of this Court's Order, yet chose to ignore it until the eleventh hour, and even then, only partially. This is not a case of oversight or misunderstanding, but of intentional and strategic defiance of a federal court order.

Such deliberate misconduct, especially from a state agency, demands a punitive response commensurate with its severity. It threatens the very foundations of our legal system, where court orders are expected to be respected and followed, not manipulated for tactical advantage.

## D. The Scope of Punitive Damages

Jordan, as assignee of all claims for Prehired, LLC, Prehired Accelerator, LLC, and Prehired Recruiting, LLC as it relates to the State of Washington, and seeks punitive damages on behalf of all these entities. The Court should consider the full scope of the State's violation in determining an appropriate punitive award.

In light of these factors, Jordan respectfully submits that punitive damages of up to $1,000,000 may be necessary to ensure the State's future compliance with court orders and to serve as a deterrent against similar misconduct. This Court has the authority and, Jordan argues, the duty to impose such damages to protect the integrity of its orders and the judicial process as a whole.

## IX. CONCLUSION

The Court must recognize that under the Order's own definition, Jordan is a 'Prehired Defendant', and thus is entitled to all the benefits and protections afforded to Prehired Defendants in the Order, including full release from all claims that were or could have been brought at the time of the Order. For the foregoing reasons, Jordan respectfully requests that the Court grant the relief sought in the Motion, interpret the Order as releasing Jordan from liability, and enforce the Order accordingly.

Respectfully submitted on July 17, 2024.

By: /s/ Joshua Jordan
Joshua Jordan, admitted pro se
6650 Rivers Ave, STE 100
Charleston, SC, 29406
Tel: 843.790.3989
joshlegalstuff@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on June 17, 2024, a true and correct copy of this document is being filed to the Clerk of the United States Bankruptcy Court for the District of Delaware for filing. Upon filing, the Clerk will serve the document via the Court's CM/ECF system upon all registered participants as identified on the Notice of Electronic Filing (NEF) and in accordance with the applicable service requirements.

By: /s/ Joshua Jordan
Joshua Jordan, Pro Se

# EXHIBIT A

1

2

3

4

5

6

**FILED**

2023 MAR 21
KING COUNTY
SUPERIOR COURT CLERK

CASE #: 21-2-14830-8 SEA

7

8

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

9

10

11

12

13

14

15

16

EMILY TOBIN, by and through her guardian
Jamie Odom,

Plaintiff,

v.

AYASHA ADULT FAMILY HOME LLC;
AYASHA AND BIKAL CHHETRY, a
married couple; and THE STATE OF
WASHINGTON, DEPARTMENT OF
SOCIAL AND HEALTH SERVICES,

Defendants.

No. 21-2-14830- 8 SEA

ORDER GRANTING PLAINTIFF'S
MOTION FOR DISCOVERY
SANCTIONS

17

18

19

20

21

22

23

24

25

26

27

28

Any lawyer practicing in this State should get an uneasy feeling when a request for sanctions is made under the seminal case of *Washington State Physicians Insurance Exchange & Association v. Fisons Corporation*, 122 Wn.2d 299, 858 P.2d 1054 (1993). This is so because *Fisons* was a turning point for sanctions in Washington's courts, ushering in different requirements for lawyers involved in discovery and creating a different standard by which to evaluate conduct during discovery. No longer was it (or is it now) acceptable to play games in discovery or to be ignorant of one's discovery obligations; rather, the case makes plain that "a spirit of cooperation and forthrightness during the discovery process is necessary for the proper functioning of modern trials[.]" *Id.* at 342. Perhaps the biggest impact *Fisons* made on discovery was that it was no longer acceptable to claim ignorance or argue lack of intentionality when defending against a request for sanctions. Post-*Fisons*, "[w]hether an attorney has made a reasonable inquiry is to be judged by an

ORDER GRANTING PLAINTIFF'S MOTION FOR
DISCOVERY SANCTIONS - 1



Judge Michael K. Ryan
King County Superior Court

objective standard. Subjective belief or good faith alone no longer shields an attorney from sanctions under the rules." *Id.* at 343. This has been the law in Washington for nearly thirty years.

Although the "imposition of sanctions upon attorneys is a difficult and disagreeable task for a trial judge, it is a necessary one if our system is to remain accessible and responsible." *Id.* at 355. When undertaking this disagreeable task, courts must keep in mind that the "purposes of sanctions orders are to deter, to punish, to compensate and to educate." *Id.* at 356. Here, the lack of diligence, responsibility, and accountability shown by both the Washington State Attorney General's Office (AGO) and DSHS warrant substantial sanctions for the reasons explained below.[1]

## I    FINDINGS OF FACT

1)    On November 9, 2021, Ms. Emily Tobin, a developmentally disabled adult, through her guardian, sued the adult home she was placed in and DSHS. Ms. Tobin made claims of negligence alleging that DSHS, among other things, failed to provide her with adequate case management and failed to adequately investigate allegations of abuse and neglect.

2)    On November 21, 2021, DSHS, through its counsel, the AGO, received a set of discovery, which was due by December 21, 2021. On December 7, 2021, the AGO sent plaintiff's discovery requests to DSHS.

3)    At issue in this motion is the late production of 10,800 pages of documents that everyone agrees are responsive to plaintiff's initial discovery requests, and which were produced over a year late. In a CR 30(b)(6) deposition of DSHS, which included testimony regarding responses to plaintiff's discovery, the witness acknowledges that the documents at issue in this motion were located within a few hours of DSHS conducting its search in December 2021 and were not provided to the AGO until June 10, 2022.

4)    When asked why the responsive documents were not provided to its counsel upon their discovery in December 2021, DSHS explained that they had "not receive[d] an ask from the Attorney General's office to receive those until that time." In that same deposition, the witness

---

[1] In ruling on this Motion, the Court considered: (1) Plaintiff's Motion, (2) the Declaration of David P. Moody, (3) the Declarations of James M. Chong, (4) the Declaration of Ryan T. Pittman, (5) DSHS's Opposition, (6) the Declaration of Seth E. Dickey, (7) the Declaration of Shaunna Carter, (8) Ayasha Adult Home's Joinder in Part, (8) and Plaintiff's Reply. The Court also conducted oral argument on this matter on March 3, 2022.

1   also noted that it was "not uncommon for us to provide rolling productions, to get extensions, to

2   do all sorts of—I don't know—legal shenanigans with discovery deadlines." In simple terms,

3   DSHS had almost 11,000 pages of documents that were responsive to plaintiff's requests that it

4   did not turn over to its counsel for almost six months because no one at the AGO made a specific

5   request that those responsive documents be provided to their office.

6       5)    Notably, in responding to this motion, the AGO makes no attempt to explain why

7   DSHS failed to provide these documents sooner or explain why counsel did not follow up with

8   DSHS to make sure that all responsive documents were provided to them at the time DSHS located

9   these documents. The Court was not supplied with any declaration from DSHS or counsel

10  explaining this six-month delay. Thus, the Court has an evidentiary void with respect to this six-

11  month period and can only conclude that there is no reasonable justification or excuse for DSHS's

12  failure to inform its counsel about thousands of responsive documents and for the AGO's failure

13  to properly inquire of its client with respect to the completeness of its document production.

14      6)    The Court finds that DSHS's failure to turn over the documents sooner to its

15  counsel, and counsel's failure to exercise reasonable (if any) diligence with respect to these

16  documents, is a willful violation of its discovery obligations because there is no reasonable excuse

17  for this six-month delay. It is undisputed that these documents were responsive to plaintiff's

18  discovery requests, yet no one at DSHS or the AGO made any attempt to ensure that its discovery

19  obligations were timely complied with. The Court is at a complete loss to understand how a large

20  State agency, and the largest law firm in the State, could be so cavalier with respect to their

21  discovery obligations and how such a large amount of responsive material could be overlooked

22  and simply ignored for six months.

23      7)    It is apparent to the Court that DSHS and the AGO lack sufficient protocols to make

24  sure that discovery is done in a timely and complete manner. The proof is in the pudding. The very

25  fact that nearly 11,000 pages of responsive documents sat at DSHS for six months with no inquiry

26  whatsoever by their counsel is more than sufficient evidence to show that whatever protocols are

27  in place (if any exist) between DSHS and the AGO are woefully insufficient, run counter to the

28  basic principles set out in *Fisons*, and violate the spirit of the discovery rules. The lack of

1   identifiable protocols or their complete breakdown, whatever the case may be, leave this Court

2   with the distinct impression that neither DSHS nor the AGO took their discovery obligations in

3   this case seriously. This complete lack of diligence is tantamount to intentional withholding of

4   these documents because it falls so far below the standards necessary to comply with DSHS's

5   discovery obligations.

6          8)      The Court would impose a severe sanction if only the above conduct was at issue.

7   But the Court has only detailed the first of two distinct, albeit related, discovery violations.

8          9)      As noted, the documents in question were finally delivered to the AGO on June 10,

9   2022, six months after they were due. This delivery occurred because Ms. Shaunna Carter, a

10  paralegal, followed up with her contact at DSHS on June 9, 2022. In so doing, she did not let Mr.

11  Seth Dickey, one of the lawyers assigned to this case, know that she had made such contact with

12  the client or that responsive documents had been produced. As Mr. Dickey acknowledged in his

13  declaration: "I received no notification that the AGO had received the emails at issue prior to my

14  departure on June 23, 2022, for my paternal leave. [. . .] I was not aware that the production at

15  issue had been received and not produced by the AGO prior to my discovering it on December

16  6."[2] In practical reality, Mr. Dickey outsourced his discovery obligations to a paralegal that he was

17  not communicating with about his client's discovery obligations and who he was not properly

18  supervising.

19         10)     Two weeks after these documents were received, Ms. Carter loaded these

20  documents into the AGO's e-discovery software and on July 6, 2022, the review of these

21  documents was assigned to another paralegal. The record is silent as to who this paralegal was,

22  and what, if any, review of these documents was conducted from that date until early December

23

24

25  [2] Mr. Dickey told a different story to plaintiff's counsel in December 2022 after the documents were produced. In a December 14, 2022, email he stated: "As I explained during our call this morning, the emails that were recently produced came into the AGO *while I was on parental leave, sometime over the summer*." (emphasis added). This is factually inaccurate because the documents came to the AGO on June 10 and Mr. Dickey left for leave almost two weeks later, on June 23. There is no explanation in the record, other than non-communication with his paralegal, as to why Mr. Dickey was not aware of this large production of documents from his client sooner.

28

ORDER GRANTING PLAINTIFF'S MOTION FOR
DISCOVERY SANCTIONS - 4

Judge Michael K. Ryan
King County Superior Court

1  2022. Around the time Mr. Dickey went on leave, DSHS was also represented in this matter by

2  Mr. Seth Hornbrook, who did not provide any declaration in this case.

3         11)    While Mr. Dickey's declaration notes that he was not routinely checking email

4  between the time he left for paternity leave in June until his return to the office in October, he did

5  actively participate in this case. Between the time that the AGO received the documents in June

6  2022 and the time in which they were ultimately produced in December 2022, the AGO moved

7  for summary judgment on all of plaintiff's claims and sought to prevent plaintiff from taking a CR

8  30(b)(6) deposition that would address, among other things, discovery in this matter.

9         12)    The latter is particularly concerning to the Court because in opposing the CR

10  30(b)(6) deposition, the AGO took the position that such discovery was unnecessary because there

11  were no disputes as to the adequacy of DSHS's production of documents. It did so in

12  representations to plaintiff's counsel during CR 26 conferences and in briefing to this Court. For

13  example, on October 25, 2022, Mr. Dickey wrote plaintiff's counsel an email noting that because

14  "there are no allegations of discovery deficiencies" that questions to a CR 30(b)(6) witness related

15  to discovery "are outside even the discovery scope of relevance." Likewise, on November 14,

16  2022, the AGO told the Court that inquiry into discovery "was not relevant as there is no claimed

17  discovery violation, nor evidence to support any." Inherent in both these statements is the

18  representation to both the Court and plaintiff's counsel that all responsive documents had already

19  been produced. This was obviously false and the truth could have been easily ascertained.

20         13)    After the Court denied the relevant portion of the protective order regarding the CR

21  30(b)(6) deposition on December 2, 2022, Mr. Dickey apparently undertook a more thorough

22  investigation of the discovery produced in this case and determined that nearly 11,000 pages of

23  documents were in his office's possession and had not been produced. (Why this did not happen

24  sooner remains a mystery.) Upon learning of these documents, Mr. Dickey informed plaintiff's

25  counsel that his office was "preparing another discovery production, containing several thousand

26  documents relating to emails of DSHS staff, which we anticipate producing by the end of the week

27  after finishing the appropriate redactions." From the context of the email in question (Exhibit 9 to

28

ORDER GRANTING PLAINTIFF'S MOTION FOR
DISCOVERY SANCTIONS - 5

Judge Michael K. Ryan
King County Superior Court

1    the Chong Declaration), it appears to the Court that Mr. Dickey learned of these documents in his

2    preparation for the CR 30(b)(6) deposition related to discovery issues.

3          14)    On December 8, 2022, the documents were produced to plaintiff's counsel. The

4    production included 2,476 records contained in 10,800 pages of documents. In one of the produced

5    emails, a DSHS employee appears to be mocking the plaintiff (who is developmentally disabled)

6    and making light of concerns regarding her care. These documents are also directly relevant to

7    plaintiff's allegations that DSHS failed to ensure that plaintiff's needs were being taken care of in

8    an appropriate manner. Thus, not only are these documents relevant and responsive to plaintiff's

9    discovery requests; they are also potentially material to the issues that have already been decided

10   on summary judgment and for which extensive discovery has already occurred.

11         15)    In opposing this Motion, the AGO takes the basic position that because counsel did

12   not intentionally hide these documents from production that sanctions are not warranted. For

13   example, Mr. Dickey explains that he did not become aware of these documents until December

14   6, 2022, even though they were in his office's possession as of June 10, 2022, and therefore no

15   sanctions should issue. This is a misstatement of the law under *Fisons*, which has been the law in

16   this State for nearly thirty years. While intentionality may go to the magnitude of the sanction,

17   intentionality is not required for the issuance of sanctions in the first place. Even so, the AGO's

18   argument suggests that it is somehow permissible for an attorney to outsource its discovery

19   obligations to a paralegal, then fail to communicate with that paralegal about discovery, and that

20   such a dereliction of responsibility cannot be seen an intentional. The Court disagrees.

21         16)    Even assuming Mr. Dickey did not actually become aware of the existence of these

22   documents until December 2022, that fact is not particularly relevant to the Court's consideration

23   of the issue for several reasons. First, attorneys have an obligation under both the discovery and

24   ethical rules to make sure that those individuals who they supervise or delegate work to, including

25   paralegals, are appropriately supervised. That clearly did not happen in this case. It is insufficient

26   to lay the blame for these discovery failures at the feet of a paralegal who Mr. Dickey (and others

27   in his office) was supposed to be supervising. The buck stops with counsel, not their paralegal. By

28   maintaining no supervision over his paralegal, Mr. Dickey acted with willful disregard for his

ORDER GRANTING PLAINTIFF'S MOTION FOR
DISCOVERY SANCTIONS - 6

duties as a supervising attorney and this is tantamount to an intentional act under the circumstances of this case.

17) Second, it is incumbent upon attorneys and the law firms to put appropriate processes and procedures in place to ensure that their discovery obligations are being met. Here, it is apparent to the Court that the AGO has no reliable protocols in place to address (1) the activities of their paralegals with respect to discovery and (2) how cases are covered by other attorneys when an attorney is absent from the office for an extended period. If such processes and protocols existed, the Court would have expected a declaration explaining those procedures. At oral argument, neither Mr. Dickey nor Mr. Hornbrook were able to provide the Court with any detailed explanation of how nearly 11,000 pages of documents were able to fall through the cracks for almost a year.

18)    The lack of processes and procedures by the State's largest law firm is very concerning to the Court because it evinces a reckless approach to discovery and case management. The Court is left to ponder the following: How can an institution as large as the AGO not have proper procedures in place to make sure that all its cases are being properly handled when an attorney is absent for an extended period and how can there be little to no communication between a paralegal overseeing discovery and the attorney for whom they are working with on a matter? This lack of internal safeguards is deeply troubling to the Court and demonstrates that the largest law firm in Evergreen State does not have adequate procedures in place to ensure that its discovery obligations are being met.

19)    Nor is the first time that the AGO has been called to task for its lack of appropriate procedures. As plaintiff points out, the AGO, and DSHS specifically, have been sanctioned for similar discovery conduct in the past. Evidently, despite the judiciary's best efforts, neither the AGO nor DSHS have learned their lesson when it comes to complying with their discovery obligations. Although it occurred in a different context, the AGO's lack of internal controls has been called out by the Court of Appeals. *See, e.g., Beckman v. DSHS*, 102 Wn. App. 687, 695-96, 11 P.3d 313 (2000). The situation at present is little more than a continuation of conduct that has plagued the AGO and DSHS for nearly thirty years. Unless and until the AGO and DSHS take

ORDER GRANTING PLAINTIFF'S MOTION FOR
DISCOVERY SANCTIONS - 7

**Judge Michael K. Ryan**
King County Superior Court

1    their discovery obligations seriously, and commit the appropriate resources to developing internal

2    controls, the Court has grave concerns that other cases will be impacted by the lack of internal

3    controls at DSHS and the AGO.

4    20)    Rather than take responsibility for its client's failure to provide responsive

5    documents for over six months to its counsel or acknowledging that it lacks adequate internal

6    safeguards to prevent against this type of discovery abuse, the AGO instead tries to point the finger

7    at plaintiff and her counsel. For example, although it has not issued any discovery requests to

8    plaintiff, the AGO tries to excuse its conduct by alleging that plaintiff has not been entirely

9    forthcoming with her discovery. The Court is not impressed with this argument. Two wrongs don't

10   make a right: One party's failure to comply with its discovery obligations does not excuse the other

11   party from shirking and ignoring its discovery obligations. Moreover, the AGO went so far as to

12   accuse plaintiff's counsel of judge-shopping even though it knows that the only reason this motion

13   is before this Court and not the prior judge assigned to this case is because of timing issues related

14   to the resolution of this motion. What these arguments demonstrate to the Court is that the AGO

15   does not understand, or simply refuses to acknowledge, the gravity of its discovery violations or

16   its basic obligations under the discovery rules.

17   21)    The Court finds that production of almost 11,000 pages of documents over a year

18   past when they were due, substantially prejudiced the plaintiff in preparing for trial. Without the

19   benefit of this evidence, the plaintiff undertook depositions, prepared its experts, had to respond

20   to a summary judgment motion, respond to a portion of a protection order motion based on a false

21   premise, and lost other opportunities to request additional discovery. The prejudice to plaintiff's

22   trial preparation is manifest and profound. A year of litigation has been lost without the plaintiff's

23   ability to use these documents in shaping future discovery requests and in making strategic

24   decisions as to how it wants to present its case. Any suggestion to the contrary ignores the

25   magnitude of the discovery violations at issue and runs counter to the teachings of *Fisons* and its

26   progeny.

27

28

1    22)    The discovery violations in this case are egregious, serious, without excuse and the

2    result of willful disregard of discovery obligations by both DSHS and the AGO. Punitive sanctions

3    are warranted.

4                              **II      CONCLUSIONS OF LAW**

5    1)    The rules governing discovery are premised on the fundamental principles that a

6    spirit of forthrightness and diligence during the discovery process is necessary for the efficient

7    functioning of modern litigation. Both clients and lawyers alike must take their discovery

8    obligations seriously and the failure to do so warrants sanctions.

9    2)    The Civil Rules require any party or lawyer answering discovery to do so fully

10   without evasion and with reasonable and responsible diligence. One of these requirements is that

11   parties must fully answer all interrogatories and requests for production, absent some form of a

12   protection order. Civil Rule 26(g) places upon attorneys an affirmative duty to ensure that

13   discovery responses are complete, and all responsive information and documents are provided.

14   3)    As explained at the outset, intentionality is not required before a sanction issued.

15   Intentionality can, however, be considered when assessing the magnitude of the sanctions imposed.

16   *Fisons*, 122 Wn.2d at 356 ("The wrongdoer's lack of intent to violate the rules . . . may be

17   considered by the trial court in fashioning sanctions.").

18   4)    The lack of diligence and internal controls exhibited by both DSHS and the AGO

19   are tantamount to an intentional act because they fall so far below what the Civil Rules and *Fisons*

20   requires.

21   5)    This Court has broad discretion in sanctioning a party for its discovery violations

22   and when doing so must keep in mind that the purposes of such sanctions are to deter similar

23   conduct from occurring in the future, to punish the wrongdoer, to compensate the opposing party

24   for the discovery violations, and to educate both the litigants before it, the Bar, and the public as a

25   whole. When considering certain sanctions such as default or exclusion of witness, the Court must

26   assess prejudice to the opposing party's trial preparation, the willfulness of the conduct at issue,

27   and whether a less severe sanction is warranted.

28

6)    The Court considered a range of sanctions when assessing the egregious discovery violations at issue. The Court considered, but will not impose, the sanction of default. The egregious nature of the discovery violations here are akin to those discussed by our Supreme Court in *Magana v. Hyundai Motor Corp.*, 167 Wn.2d 570, 220 P.3d 191 (2012), where a default judgment was upheld on appeal. Nor does the Court believe that striking any of the DSHS's affirmative defenses or excluded witnesses a good fit for the situation here.

7)    The sanctions outlined below will deter DSHS, the AGO, and future litigants from engaging in similar behavior in discovery, will punish DSHS and the AGO for their egregious discovery conduct, will educate DSHS, the AGO and future litigants that such actions are deleterious to the principle of forthrightness and diligence in discovery, and will compensate plaintiff for the time, effort, and energy expended in this matter that was impacted by DSHS's and the AGO's discovery violations.

8)    The punitive monetary sanction to be issued by the Court is consistent with *Fisons'* instruction that such awards need not be made payable to the wronged party, but rather to court-related funds. 122 Wn.2d at 356.

9)    Sanctioning attorneys and litigants is a disagreeable task and one this Court does not take lightly but the circumstances here warrant severe sanctions.

### III    ORDER

1)    DSHS and the AGO, jointly and severally, shall pay $200,000, to the King County Sexual Assault Resource Center as a punitive sanction. Such payment shall be made within ten (10) days of the date of this Order. Proof of payment shall be filed with Court.

2)    The summary judgment order dated September 23, 2022, is vacated. Although such orders are interlocutory in nature, and either party is free to file another summary judgment at any time prior to the summary judgment cut-off in the case schedule absent such vacation, the Court nevertheless vacates the summary judgment order. Any party to this case may properly note and file a summary judgment with this Court and plaintiff may seek leave to file a summary judgment motion outside the time prescribed in the case scheduling order if necessary.

3)    Plaintiff is entitled to recover all attorney fees and costs associated with the following: (1) this motion, (2) the motions for summary judgment, and (3) DSHS's motion for a protective order. Within ten (10) days of the date of this Order, plaintiff and the AGO are ordered to meet and confer regarding an appropriate amount of those fees. If they cannot agree on an amount, plaintiff shall file, within ten (10) days of the date of the meet and confer, a motion for fees with the appropriate documentation to allow this Court to assess the reasonableness of the rates and hours requested.

4)    Plaintiff may re-depose any witness previously deposed in this case, including witnesses not under the control of DSHS. DSHS and the AGO shall be responsible for all attorney fees and costs associated with those depositions, including any costs borne by the other defendants in this case. Once these depositions are completed, all parties shall, within ten (10) days, meet and confer to see if they can agree on an amount. If the parties cannot agree on an amount, any party shall file, within ten (10) days of the date of the meet and confer, a motion for fees with the appropriate documentation to allow this Court to assess the reasonableness of the rates and hours requested.

5)    Within fifteen (15) days of the date of this Order, the Court will appoint a Special Master, at the expense of DSHS and the AGO, to: (1) review the sufficiency of all claimed privileges; and (2) to inspect and report to the Court whether all written discovery requests propounded by plaintiff has been thoroughly and completely answered and all responsive documents have been produced.  The Special Master may, at his/her discretion, retain a forensic computer expert to assist with the Special Master's review. Within 5 days of the entry of this order, plaintiff's counsel shall submit three names to this Court to consider for this role. The other defendants in this case are not subject to any review or oversight by the Special Master.

6)    Within fifteen (15) days of the date of this Order, DSHS and/or the AGO shall provide updated privilege logs, which "identify the nature of each document to be withheld or redacted, its date, the parties thereto, and the specific statute or regulation that justifies the failure to disclose. The privilege log must make clear which basis for redaction/withholding applies to which information'.

ORDER GRANTING PLAINTIFF'S MOTION FOR
DISCOVERY SANCTIONS - 11

**Judge Michael K. Ryan**
King County Superior Court

1   *Tamas v. State of Washington, DSHS*, No. C07-0750RAJ, 2008 WL 11506717, at *2 (W.D. Wash.

2   Oct. 3, 2008).

3         7)     The discovery cutoff is extended 30 days for plaintiff only—until May 17, 2023.

4         8)     Failure to timely comply with any provision of this Order may result in additional

5   sanctions.

6         Dated this 21st day of March 2023.

THE HONORABLE MICHAEL K. RYAN

# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Prehired, LLC, et al,<br><br>Debtors | Chapter 7<br><br>Case No.: 1:22-bk-11007 (JTD)<br><br>Adv. Proc. No. 23-50438 (JTD) |

**ORDER GRANTING INTERVENOR JORDAN'S MOTION**

**TO ENFORCE THE FINAL JUDGMENT AND ORDER**

Upon consideration of Intervenor Joshua Jordan's Motion to Enforce the Final Judgment and Order [D.I. 222] (the "Motion to Enforce"), the Response filed by the State of Washington, Jordan's Reply, and any other responses thereto, and after due deliberation thereon, and sufficient cause appearing therefor, **IT IS HEREBY ORDERED**:

1. The Motion to Enforce is **GRANTED**.

2. The Court declares that Joshua Jordan is a released party under the Stipulated Final Judgment and Order [Case No. 22-11007, Docket No. 211-2] (the "Order") as an assignee of Prehired, LLC, as defined under Prehired Defendants in the Order.

3. The State of Washington is enjoined from pursuing any claims against Joshua Jordan that were released under the Order.

4. The State of Washington shall dismiss with prejudice all claims against Joshua Jordan in the action pending in the King County Superior Court, State of Washington v. Prehired LLC et al., No. 22-2-08651-3 SEA, within 14 days of the date of this Order.

5. The State of Washington is directed to file appropriate motions or pleadings in the King County Superior Court, State of Washington v. Prehired LLC et al., No. 22-2-08651-3 SEA, within 30 days of the date of this Order, to vacate the judgment against Joshua Jordan in light of this

Court's interpretation of the Order [Case No. 22-11007, Docket No. 211-2]. The State of Washington shall file a status report with this Court within 45 days of the date of this Order, detailing its compliance with this directive.

6. The State of Washington shall pay punitive damages to Joshua Jordan, both in his personal capacity and as assignee of the claims of the Prehired entities, in the amount of $_____, but not to exceed $1,000,000 per entity. This amount reflects the seriousness of the State's misconduct, the need to deter future violations, the 30 year pattern of misconduct plaguing the State has gone uncorrected and the fact that previous sanctions in its own courts have not been sufficient to ensure compliance with court orders, the fact that Jordan was force to spend more than $2 million in related actions to the State, and the multiple entities affected by the State's actions.

7. The State of Washington shall pay compensatory damages to Joshua Jordan, both in his personal capacity and as assignee of the claims of the Prehired entities (including Prehired, LLC, Prehired Accelerator, LLC, and Prehired Recruiting, LLC), for reasonable legal costs and fees, including reasonable attorney fees, incurred as a result of the State's violation of the Order. These compensatory damages shall cover reasonable costs and fees incurred by Jordan personally and by the Prehired entities. If the parties cannot agree on the amount of these compensatory damages within 30 days of this Order, they shall submit their respective positions to this Court, and the Court will schedule a hearing to determine the appropriate amount.

8. The Court retains jurisdiction to enforce this Order.

Align top of FedEx Express® shipping label here.

ORIGIN ID:FLOA  (843) 409-4497
JOSHUA JORDAN

3223 TWIN CHURCH RD

TIMMONSVILLE, SC 29161
UNITED STATES US

SHIP DATE: 17JUL24
ACTWGT: 0.40 LB
CAD: 6994088/SSFE2521

BILL CREDIT CARD

TO **CLERK OF COURT**
**US BANKRUPCY COURT DELWARE**
**824 MARKET ST N**
**3RD FLOOR**
**WILMINGTON DE 19801**
(302) 262-2900          REF:
INV:
PO:                              DEPT:





FedEx
Express

**E**

TRK# 2771 8075 4705
0201

FRI – 19 JUL 5:00P
** 2DAY **

**SP ZWIA**

19801
DE-US  PHL



# Envelope
## Recycle me.